UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| MAURICE KONIG, | ) | Case No.:  7:18-cv-07299 |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| | ) | |
| | ) | |
| TRANSUNION, LLC; EQUIFAX | ) | |
| INFORMATION SERVICES, LLC, BANK | ) | |
| OF AMERICA, N.A., | ) | |
| | ) | |
| Defendants. | ) | |

---

**REPLY MEMORANDUM IN FURTHER SUPPORT OF PLAINTIFF
MAURICE KONIG'S MOTION FOR CLASS CERTIFICATION**

---

James A. Francis*
John Soumilas*
Lauren KW Brennan*
**Francis Mailman Soumilas, P.C.**
1600 Market Street, Suite 2510
Philadelphia, PA 19103
(215) 735-8600
jfrancis@consumerlawfirm.com
jsoumilas@consumerlawfirm.com
lbrennan@consumerlawfirm.com

Daniel Zemel, Esq.
Elizabeth Apostola, Esq.
**Zemel Law LLC**
660 Broadway
Paterson, New Jersey 07514
(862) 227-3106
dz@zemellawllc.com
ea@zemellawllc.com

*Attorneys for Plaintiff and the
Proposed Classes*

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ...................................................................................ii

I.     INTRODUCTION ....................................................................................1

II.    LEGAL STANDARD FOR ARTICLE III STANDING ................................2

III.   ARGUMENT ..........................................................................................5

    A.    The BANA Class and Subclass Should Be Certified ...............................5

        1.    The BANA Class And Subclass Are Properly Defined And Contain Thousands of Members .............................................................5

        2.    Article III Standing Is Satisfied For Plaintiff And All Members of The BANA Class ...................................................................8

            a.    Plaintiff's Article III Standing ..........................................9

                i.    Communication By Furnisher To A CRA Is Publication Giving Rise To Standing ....................................9

                ii.    BANA Communicated Misleading And Harmful Information to Trans Union ................................11

            b.    Plaintiff Has Presented Sufficient Evidence Of Class Standing ....12

        3.    Plaintiff And All Class Members Have The Same Well-Recognized Section 1681s-2(b) Claim .........................................................13

        4.    Plaintiff Is A Typical And Adequate Representative Of The BANA Class ..............................................................................15

        5.    Common Issues Predominate With Respect To The BANA Class ............18

    B.    The Trans Union Class Should be Certified ..........................................19

        1.    Plaintiff Has Presented Uniform Evidence Supporting His Theory of Obsolescence ...........................................................................20

        2.    Publication Can Be Shown Through Objective Evidence In Trans Union's Possession ...............................................................................24

        3.    The Elements of Rule 23 Are Satisfied ......................................26

        4.    Plaintiff Has Made A Sufficient Showing Of Article III Standing At This Stage ......................................................................................28

IV.    CONCLUSION ......................................................................................30

## **TABLE OF AUTHORITIES**

**Page(s)**

### CASES

*Annunziato v. Collecto, Inc.*,
  293 F.R.D. 329 (E.D.N.Y. 2013) ........................................................................ 15

*Artemov v. Trans Union, LLC*,
  2020 WL 5211068 (E.D.N.Y. Sept. 1, 2020) ...................................................... 12

*Barrows v. Becerra*,
  24 F.4th 116 (2d Cir. 2022) ................................................................................ 16

*Boggio v. USAA Fed. Sav. Bank*,
  696 F.3d 611 (6th Cir. 2012) .............................................................................. 14

*Calvo v. City of N.Y.*,
  2017 WL 4231431 (S.D.N.Y. Sept. 21, 2017) ..................................................... 6

*Cohen v. Experian Information Solutions, Inc*,
  2021 WL 413494 (E.D.N.Y. Feb. 5, 2021) ......................................................... 12

*Comer v. Cisneros*,
  37 F.3d 775 (2d Cir. 1994) ................................................................................. 27

*Denney v. Deutsche Bank AG*,
  443 F.3d 253 (2d. Cir. 2006) ........................................................................ 13, 28

*Ebin v. Kangadis Food Inc.*,
  297 F.R.D. 561 (S.D.N.Y. 2014) ....................................................................... 25

*Ewing v. MED-1 Sols., LLC*,
  24 F. 4th 1146 (7th Cir. 2022) ................................................................. 10, 11, 12

*George v. Shamrock Saloon II LLC*,
  2019 WL 8106153 (S.D.N.Y. Aug. 7, 2019) ...................................................... 19

*Gissler v. Pennsylvania Higher Education Assistance Agency*,
  2017 WL 4297344 (D. Colo. Sept. 28, 2017) .................................................... 14

*Goldemberg v. Johnson &Johnson Consumer Cos., Inc.*,
  317 F.R.D. 374 (S.D.N.Y. 2016) ....................................................................... 26

*Gorman v. Wolpoff & Abramson, LLP*,
  584 F.3d 1147 (9th Cir. 2009) ............................................................................ 14

*Grauman v Equifax Info. Servs., LLC*,
   549 F. Supp. 3d 285 (E.D.N.Y. 2021) ................................................................... 29

*Gross v. TransUnion, LLC*,
   ___ F. Supp. 3d ___ ............................................................................................... 8

*Hargrove v. Sleepy's, LLC*,
   974 F.3d 467 (3d Cir. 2020) .................................................................................. 26

*Harte v. Ocwen Fin. Corp.*,
   2018 WL 1830811 (E.D.N.Y. Feb. 8, 2018) ......................................................... 27

*Houston v. TRW Info. Servs., Inc.*,
   707 F. Supp. 689 (S.D.N.Y. 1989) ....................................................................... 24

*In re Initial Public Offering Sec. Litig.*,
   471 F.3d 24 (2d Cir. 2006) .................................................................................... 24

*Jones v. Sterling Infosystems, Inc.*,
   317 F.R.D. 404 (S.D.N.Y. 2016) ........................................................................ 7, 8

*Kelly v. RealPage, Inc.*,
   2022 WL 3642113 (3d Cir. Aug. 24, 2022) ............................................... 7, 25, 26

*In re Kind LLC "Healthy & All Natural" Litig.*,
   337 F.R.D. 581 (S.D.N.Y. 2021) .......................................................................... 24

*Lackawanna Chiropractic P.C. v. Tivity Health Support*, LLC,
   2021 WL 3827733 (W.D.N.Y. Aug. 27, 2021) ..................................................... 30

*In re LIBOR-Based Financial Instruments Antitrust Litig.*,
   29 F. Supp 3d 430 (S.D.N.Y. 2018) ...................................................................... 6

*Lichtman v. Chase Bank USA*,
   NA, 2020 WL 1989486 (S.D.N.Y. Apr. 27, 2020) ............................................... 15

*Longman v. Wachovia Bank, N.A*,
   702 F.3d 148 (2d Cir. 2012) .................................................................................. 14

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992) ................................................................................................ 2

*McKeage v. TMBC, LLC*,
   847 F.3d 992 (8th Cir. 2017) ................................................................................ 25

*Myers v. Am. Educ. Servs.*,
   2021 WL 859537 (S.D. Ohio Mar. 8, 2021) ........................................................ 15

iii

*In re Nassau Cty. Strip Search Cases*,
461 F.3d 219 (2d Cir. 2006) ..................................................................... 28

*Nnebe v. Daus*,
2022 WL 1204700 (S.D.N.Y. Apr. 22, 2022) ........................................... 30

*In re Petrobras Sec.*,
862 F.3d 250 (2d Cir. 2017) .............................................................. 25, 26

*Ramirez v. TransUnion, LLC*,
951 F.3d 1008 (9th Cir. 2020) .............................................................. 2, 3

*Romero v. La Revise Assocs., L.L.C.*,
58 F. Supp. 3d 411 (S.D.N.Y. 2014) ........................................................ 27

*Saunders v. Branch Banking & Tr. Co. of Va.*,
526 F.3d 142 (4th Cir. 2008) ................................................................... 14

*Scheel-Baggs v. Bank of Am.*,
575 F. Supp. 2d 1031 (W.D. Wis. 2008) ................................................... 14

*Seamans v. Temple Univ.*,
744 F.3d 853 (3d Cir. 2014) ............................................ 11, 14, 17, 18

*Soutter v. Equifax Info. Servs., LLC*,
307 F.R.D. 183 (E.D. Va. 2015) ............................................................... 26

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016) ............................................................................... 2, 3

*Sykes v. Mel S. Harris & Assoc. LLC*,
780 F.3d 70 (2d. Cir. 2015) ...................................................................... 16

*Tescher v. Experian Info. Sols., Inc.*,
2022 WL 564048 (S.D.N.Y. Feb. 23, 2022) ............................................. 15

*TransUnion, LLC v. Ramirez*,
594 U.S. __, 141 S.Ct. 2190 (2021) ................................................*passim*

*Van Veen v. Equifax Information*,
844 F. Supp. 2d 599 (E.D. Pa. 2012) ....................................................... 14

*Vossbrinck v. Accredited Home Lenders, Inc.*,
773 F.3d 423 (2d Cir. 2014) ...................................................................... 8

*Young v. Nationwide Mut. Ins. Co.*,
693 F.3d 532 Cir. 2012 ............................................................................ 25

iv

*Zlotnick v. Equifax Info. Servs., LLC,*
   2022 WL 351996 (E.D.N.Y. Feb. 3, 2022) ..................................................................... 29

## STATUTES

Fair Credit Reporting Act 15 U.S.C. §§ 1681-1681x .............................................. *passim*

   15 U.S.C. § 1681(a)(d)(1) ........................................................................................... 9

   15 U.S.C. § 1681c(c)(1) .............................................................................................. 20

   15 U.S.C. § 1681e(b) .............................................................................................. 9, 24

   15 U.S.C. § 1681g ......................................................................................................... 4

   15 U.S.C. § 1681s-2 ................................................................................... 5, 13, 14, 16

   15 U.S.C. § 1681s-2(a) .............................................................................................. 13

   15 U.S.C. § 1681s-2(a)(3) ..................................................................................... 14, 15

   15 U.S.C. § 1681s-2(a)(5)(A) .................................................................................... 17

   15 U.S.C. § 1681s-2(b) ........................................................................................ *passim*

Fair Debt Collection Practices Act ..................................................................... 10, 11

I.    **INTRODUCTION**

Defendants Bank of America, N.A. ("BANA") and Trans Union, LLC ("Trans Union") filed separate oppositions to Plaintiff's class certification motion, and Plaintiff addresses the arguments made in each separately below.  But Defendants' oppositions are strikingly similar in their failure to squarely address the Rule 23 questions at issue at this stage of the litigation, instead choosing to focus on the merits of the case that should be left for trial, and questions of Article III standing that are foreclosed by circuit and Supreme Court precedent. But disagreement with Plaintiff's merits arguments is not a basis to deny class certification – indeed, it only serves to make clear that Plaintiff's claims present common questions of law and fact that can be resolved collectively for hundreds or thousands of individuals at once, making class treatment appropriate.

The practical reality here is that Konig was not the only BANA customer who became delinquent on a loan or whose credit history BANA furnished to Trans Union though the usual computer platform, eOSCAR.  Nor is he the only one who disputed the status of his accounts after they reported as "adverse" for more than 7and ½ years, and which BANA and Trans Union processed in their usual manner via a computerized ACDV exchange.  Nor are Konig's accounts the only ones that continued reporting even after his disputes, not even noting that the consumer disputed, pursuant BANA's uniform practice. Because discovery has revealed numerous consumers like Konig, the claims at issue in this motion should be resolved on a class wide basis.

Both BANA and Trans Union bemoan the duration of discovery in this matter, a process that was greatly extended by Defendants' own intransigence and (perhaps intentional) misinterpretation of Plaintiff's discovery requests. But the reality is that Rule 23 does not look to the amount of time it took to conduct discovery – the only question presented at this stage is whether the evidence gleaned from that discovery can be used to identify one or more cohesive

classes who share common issues of law that can be resolved through reference to evidence that will be similar for all class members.  That is the case here.

The record shows that common and predominating issues of law and fact exist for the BANA Class and Subclass and the Trans Union Class, and that Plaintiff is an adequate and typical representative of each class.   Each class should therefore be certified.

## II.    LEGAL STANDARD FOR ARTICLE III STANDING

Because both Defendants invoke Article III standing and the recent U.S. Supreme Court decision in *TransUnion, LLC v. Ramirez*, 594 U.S. __, 141 S.Ct. 2190 (2021) as a basis for denial of class certification, a discussion of the decision and general standing principles is warranted.

The party invoking federal court jurisdiction bears the burden of showing that (1) the plaintiff has suffered an injury-in-fact, (2) the injury was caused by the defendant, and (3) the injury is redressable by judicial relief. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).  In order to qualify as an "injury-in-fact," the injury must be both particularized and concrete.  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340 (2016). Both *Spokeo* and *TransUnion* addressed the requirement of a concrete injury, finding it essential to standing: "No concrete harm, no standing." *TransUnion*, 141 S. Ct. at 2200 (citing *Spokeo*).

The *TransUnion* decision involved claims under the Fair Credit Reporting Act ("FCRA"), and a certified class of 8,185 consumers who had been erroneously linked to possible terrorist records using a name-only match logic, and who received the same file disclosure documents as plaintiff Ramirez. *Ramirez v. TransUnion, LLC*, 951 F.3d 1008, 1022 (9th Cir. 2020). Trans Union's records showed that it disseminated an inaccurate record on reports furnished to third party creditors affecting about 25% of the class members. *Id.* at 1027. Ramirez and the class sought only FCRA statutory and punitive damages. *Id.* at 1041. At trial, the jury found in favor of the full class and awarded each class member $984.22 in statutory damages and $6,353.08 in punitive damages.

*Id.* at 1027. Trans Union asserted on appeal that about 75% of class members did not experience a sufficiently concrete injury giving rise to Article III standing for either the reported inaccuracy or the file disclosure claims. *Id.* at 1022-23.

On appeal to the Supreme Court, a 5-4 majority reversed and remanded for further proceedings. The Court's opinion begins with a broad discussion of the principles of Article III standing and the requirement of a concrete injury, including precedent establishing that "courts should assess whether the alleged injury to the plaintiff has a 'close relationship' to a harm 'traditionally' recognized as providing a basis for a lawsuit in American courts." *TransUnion*, 141 S. Ct. at 2204 (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016)). The Court emphasized that "certain harms readily qualify as concrete injuries under Article III. The most obvious are traditional tangible harms, such as physical harms and monetary harms." *Id.*

The Supreme Court affirmed that "intangible injuries can nevertheless be concrete[.]" *TransUnion*, 141 S. Ct. at 2204. While courts should look to "harms traditionally recognized as providing a basis for lawsuits" in evaluating whether an intangible injury is concrete, the *TransUnion* court made clear that "*Spokeo* does not require an exact duplicate in American history and tradition." 141 S. Ct. at 2204.

The *TransUnion* Court also reaffirmed prior Supreme Court precedent making clear that the burden required to show standing is not a monolithic concept, but rather evolves in accordance "with the manner and degree of evidence required at the successive stages of the litigation." 141 S.Ct. 2208 (quoting *Lujan*, 504 U.S. at 561). Indeed, the Supreme Court explicitly acknowledged that its decision addresses only the burden for proving standing to recover money *following a trial on the merits*. *See* 141 S. Ct. at 2208 (holding that "in a case like this that proceeds *to trial*, the specific facts set forth by the plaintiff to support standing 'must be supported adequately by the evidence adduced *at trial*.'") (citing *Lujan*) (emphasis added).

Turning to the specific claims at issue, the Court held that, with respect to the possible terrorist match claim, only the 25% of class members for whom there was evidence of publication to a third party had Article III standing because publication to a third party is required for there to be a close relationship between an FCRA inaccuracy claim and the traditionally recognized harm of defamation. *Id.* at 2208-13. The Supreme Court's analysis makes it plain that what matters is whether the communication to a "third party" is objectively "misleading," and did not even need to consider whether any particular third party properly understood, reacted to, or was actually misled by the communication. The Court held that the harm suffered by 1,853 class members (the 25%) that conferred standing *for all of them* was the publication of a misleading report because such a misleading publication created reputational harm with a "close relationship" to defamation. *Id*. at 2208-09 ("We have no trouble concluding that the 1,853 class members [whose reports were furnished to third parties] suffered a concrete harm that qualifies as an injury in fact.").

The Court's decision, and its characterization of the decision as an easy one, was a pointed rejection of Trans Union's argument that Article III requires more than just dissemination of an inaccurate report as a prerequisite to injury-in-fact. Trans Union vociferously argued that downstream consequences beyond mere dissemination were required to satisfy Article III. Br. for Petitioner Trans Union, LLC at 42, No. 20-297 (Feb. 1, 2021), 2021 WL 409753 (arguing "Ramirez never presented a single piece of evidence showing that any absent class member suffered any injury on account of having a credit report containing a 'potential match' alert disseminated to a third party. For all the record shows, the potential creditor or employer who received such a report quickly dismissed the 'potential match' alert after cross-checking it against additional information, such as a birthdate - just as TransUnion instructed.").

With respect to the other class members (the 75%) and the disclosure claims under FCRA section 1681g, the Court found Article III standing was lacking because they demonstrated "only

that they received [the file disclosure] *in the wrong format*," *id.* at 2214 (emphasis original), and had "not demonstrated that the format of TransUnion's mailings caused them a harm with a close relationship to a harm traditionally recognized as providing a basis for a lawsuit in American courts." *Id.*  The Supreme Court noted in *dicta* in response to argument raised by *amicus* that standing for a disclosure claim might be proven through a showing of "downstream consequences" from a statutory violation, but that no evidence of such consequences existed in the case.  *Id.*

### III.   <u>ARGUMENT</u>

#### A.   <u>The BANA Class and Subclass Should Be Certified</u>

BANA's opposition to class certification in this matter rests largely upon three inaccurate premises:  first, that there are purportedly no class members; second, that BANA's obligation to mark an account as disputed after it receives notice of a dispute made to a consumer reporting agency ("CRA") arises under section 1681s-2(a) of the Fair Credit Reporting Act; and third, that consumers must supposedly provide evidence of an *additional* harmful publication, beyond third party publication, in order to show concrete harm giving rise to Article III standing.  Because each of these arguments fails, so do the typicality, adequacy, and predominance arguments BANA makes based on them.

##### 1.   *The BANA Class And Subclass Are Properly Defined And Contain Thousands of Members*

BANA begins by complaining that Plaintiff has conducted discovery to identify other individuals who had a similar experience as Plaintiff after making a dispute to a CRA regarding a BANA account, and adjusted the proposed class definition to reflect the results of this discovery. BANA suggests that adjusting the class definition in this way is somehow improper, but the opposite is true: it is well-settled that courts are not bound by the class definition plead in the

complaint, and it is appropriate to adjust the class definition to reflect the evidence. *See In re LIBOR-Based Financial Instruments Antitrust Litig.*, 29 F. Supp 3d 430, 463-64 (S.D.N.Y. 2018).[1]

BANA next asserts that the BANA Class and Subclass purportedly have no members at all,

████████████████████████████████████████████████████████████████████

███████████████████████ ECF 223 at pp. 11-12 (Pl. Mot. for Class Certification).  This claim rests on BANA's continued assertion that it is unable to identify any individuals for whom the tradeline data in its records is both "adverse" (*e.g.,* solely delinquency payment history) *and* "aged" (*e.g.,* last payment was made more than seven-and-one-half years ago). ████████████████████

████████████████████████████████████████████████████████████████████

██████ ECF 241, BANA Opp. at pp. 10-11.

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████ ECF 225-3 at pp. 2-5 (Ex. 17, BANA's responses to Pl. Interrogatories).[2]  Because every account identified has solely delinquent payment history throughout the ACDV records searched (which contain 7 years and 7 months of data), and because the date of last payment of all accounts is at least seven-and one-half years prior to the date of the dispute, each individual identified in those responses has the same profile as Konig and meets the class definition.[3]

---

[1] The "magical shape-shifter" class definition BANA evokes through quotation from *Calvo* was a definition that changed "within Plaintiffs' own brief and even during oral argument." *Calvo v. City of N.Y.,* 2017 WL 4231431, at *3 (S.D.N.Y. Sept. 21, 2017) (cited at pp. 7-8 of BANA's opposition brief). The same cannot be said to be true here.
[2] Unless otherwise indicated, citations herein to materials already of record are to the under-seal versions attached to the Declaration of John Soumilas (ECF 225), with pinpoint citations to ECF-stamped pages.  Additional record evidence necessary to reply to Defendants' opposition arguments is attached to the Declaration of John Soumilas in Support of Plaintiff's Reply Memorandum in Further Support of his Motion for Class Certification ("Soumilas Reply Decl.") as "Ex. 33" and "Ex. 34."
[3] ██████████████████████████ ECF 241 at p. 6, ██████
████████████████████████████████████████████████████████

In light of the above, BANA's reliance on *Jones v. Sterling Infosystems, Inc.*, 317 F.R.D.

404 (S.D.N.Y. 2016) is misplaced, and BANA mischaracterizes its holding – in *Jones* the plaintiff

argued that Sterling's reports were uniformly incomplete because they relied upon a source of

information that did not provide all available personal identifying information. 317 F.R.D. at 408.

The court found that FCRA "completeness" applies only to the public record status of an item, and

not to the range of identifiers used to match the record to the individual. *Id.* at 408-10. The *Jones*

---

██████████████████████████████████████████████ , *see* ECF 225-3 at

p.4. ████████████████████████████████████████

████████████████████████████ ECF 225-3 at p.4. Since "ACDV records permit confirmation of

*continuous delinquency . . . only* for 7 years and 7 months," BANA contends that it cannot be sure that that "aged"

tradelines (which by definition have a date of last payment more than seven-and-one-half years from the date of any

dispute) have been *continuously* adverse from the date of last payment. *Id.* (partial emphasis in original). This is a

convenient (and deceptive) way of finding "zero" class members because BANA's choice to use only data from

ACDVs exchanged with CRAs  in providing discovery responses here assures that unless the last payment was made

*exactly* 7 years and 7 months from the dispute date, followed immediately by 7 years and 6 months of continuous

delinquency history, no data can be available on the ACDV to satisfy both the "aged" and "adverse" criteria sought by

Plaintiff's Interrogatories. But the "gap" on which BANA so heavily relies can be filled in. BANA, like all banks, has

a payment history for *every month* of its regular accounts payment records, as demonstrated by Konig's own BANA

account records, which go well beyond the "7 years and 7 month" ACDV records, ██████████████████████

██████████████████████████████████████████████ *Compare* ECF 225-3 at pp.

██████████████████████████████████████████████ *with* ECF 225-4 at pp. 2-

30-43 (Ex. 19, ██████████████████████████

16 (Ex. 25 ██████████

████        Moreover, BANA's preferred narrative which assumes that an account that has a "last payment" more than 7

years and 7 months" from the date of the ACDV dispute and a solely adverse history throughout the  "7 years and 7

months" of available data "might" also have had some positive payment history in some mystical "gap" between the

last payment and the available delinquent history going back "7 years and 7 months" on the ACDV form, is irrelevant.

While BANA contends that such an account cannot be deemed "continuously delinquent" from the date of last payment

based on what the "gap" "might" show, this is factually incorrect. If an account contains solely adverse payment history

for 7 years and 7 months of available data, it is irrelevant whether there was a timely payment made before this period

of time—the account is both adverse and aged. In any event however, BANA of course identifies no such accounts

with payments in the "gap." Nor would such accounts exist. If the "last payment" was "aged" (older than "7 years

and 7 months" from the ACDV dispute date), it follows that no more recent "positive" history (a payment) was made

during the "gap" period.  Because if such a payment were made, the "date of last payment" would change and would

need to have been *more recent* than "7 years and 7 months" from the ACDV. And in fact, there is solely delinquent

payment history throughout the available data, rendering these accounts "adverse." At any rate, if any such accounts

exist that somehow did not have a delinquent payment history during the "gap," and inexplicably provide an instance

where the account is not both aged and adverse, BANA can remove such accounts from the class by filling in the gap

with its own regular banking records reflecting such a payment during the gap.  The fact that the bank may need to use

more than one type of record or to compare two types of records in order to ascertain a class does not defeat class

certification.  *See Kelly v. RealPage, Inc.,* ___ F. 4th ___, 2022 WL 3642113, at *17 (3d Cir. Aug. 24, 2022).  But just

from the ACDV data here there can be no question that there is both a numerous and ascertainable class of persons

just like Konig, who disputed an adverse account (nobody disputes accounts in good standing) which has not had a

payment for more than 7 years and 7 months (*i.e.*, it has aged), and which BANA failed and investigate and failed to

mark as dispute per its usual practice. This is enough for Rule 23.  *Id.*

plaintiff presented evidence that the records at issue lacked personal identifiers, but no evidence regarding the incomplete public record status of the accounts.  *Id.* at 407 n.1.  The *Jones* court therefore found that the evidence at issue did not align to the 1681k claim brought.  *Id.* at 408-10.

By contrast here, Plaintiff has presented evidence that BANA *never* marks accounts as disputed as required by FCRA section 1681s-2(b), and failed to do so with respect to thousands of accounts. ███████████████████████████████████████████████████████████████████
████████████████████████████████████ ECF 225-3 at p.13 (Ex. 17). Similarly, the evidence here shows that BANA *never* conducts any reinvestigation to locate a date of first delinquency before providing an ACDV response to a CRA where the consumer was disputing the age of an account that has been consistently delinquent, █████████████████████████████████████████
██████████████████████████████████████████████████████████████ (Ex. 17 at Resp. to Rog. 19); ECF 225-1 ████████████████████████████

The definitions of the BANA Class and Subclass proposed here are objective, cohesive, and contain thousands of members.

2.  *Article III Standing Is Satisfied For Plaintiff And All Members of The BANA Class*

BANA seeks to avoid class treatment by asserting that this Court does not have jurisdiction to hear this claim, because he purportedly lacks Article III standing.  But Plaintiff has not invoked this Court's jurisdiction – the case was removed to this Court after Plaintiff filed in state court.  *See* ECF 1 (Notice of Removal).  Thus, it is not Plaintiff's burden to show Article III standing, and the appropriate remedy if the Court finds a lack of standing is remand to state court.  *Gross v. TransUnion, LLC*, ___ F. Supp. 3d ___, 2022 WL2116669, at *1, 4 (S.D.N.Y. June 13, 2022) (remanding FCRA claim to state court); *see also Vossbrinck v. Accredited Home Lenders, Inc.*, 773 F.3d 423, 427 (2d Cir. 2014) (the defendant "may not defeat the claim by removing it to federal

court and then obtaining its dismissal on the grounds of the federal court's lack of jurisdiction"). Plaintiff nevertheless addresses each of BANA's standing arguments below, as none has merit.

a.  Plaintiff's Article III Standing

BANA asserts that Plaintiff cannot show concrete harm giving rise to Article III standing for himself individually for two reasons: (1) because he purportedly has not shown that a consumer report including the specific tradelines at issue, including the negative payment history and lack of a dispute notation, was published to a third party *by Trans Union* after BANA's response to his disputes, and (2) because the information was purportedly not harmful, where the status of the account was inaccurately reported as "current."  Both arguments fail.

i.  *Communication By Furnisher To A CRA Is Publication Giving Rise To Standing*

BANA's "publication" argument rests solely on the *TransUnion* holding that class members were required to prove publication of a consumer report at trial in order to recover monetary damages.  ECF 241 at pp. 13-14. But this ignores key differences between the FCRA section 1681e(b) claim at issue in *TransUnion*, and the section 1681s-2(b) claims at issue here: the identity of the defendant.  Because virtually any communication of consumer information to a third party made by a CRA like Trans Union is by definition a consumer report, naturally the *TransUnion* discussion revolved around publication of consumer reports.  *See* 15 U.S.C. § 1681(a)(d)(1) (defining a consumer report as "any written, oral, or other communication of any information by a consumer reporting agency" bearing on certain characteristics).  BANA, of course, is not a consumer reporting agency, and can disseminate harmful and misleading information, that is not contained in a "consumer report," on its own.

Courts addressing standing in the wake of *TransUnion* have recognized this key distinction, finding that a furnisher's own direct third-party communication of misleading information (including a failure to mark an account as disputed) to a CRA is a publication within the meaning

of *TransUnion* and sufficient to find a concrete harm. *Ewing v. MED-1 Sols., LLC*, 24 F. 4th 1146, 1153 (7th Cir. 2022). Although it dealt with claims under the Fair Debt Collection Practices Act rather than the FCRA, the Seventh Circuit's decision in *Ewing v. MED-1 Sols., LLC* is instructive, as it addressed nearly identical conduct to that at issue here: third-party communications by a furnisher to a CRA regarding the status of an account, without a notation that the account was disputed. 24 F. 4th at 1150.

The defendant debt collectors in *Ewing* argued that to show a concrete harm under *TransUnion*, consumers were required to prove that the CRA separately sent a consumer report to a potential creditor containing the misleading information the debt collectors had supplied. *Id.* at 1152-53. The Seventh Circuit firmly rejected this argument, holding that dissemination by the debt collectors to the CRAs was sufficient to find publication and concrete harm. *Id.* at 1153-54. Where a company furnishes inaccurate or misleading information to a CRA, including failing to mark an account as disputed, this qualifies as a third-party publication within the meaning of *TransUnion*, and consumers "do not have to make a further showing that the third party *also* shared that false information." *Id.* at 1153. The *Ewing* court furthermore cited evidence that the misleading information factored into consumers' credit scores was sufficient evidence to find that publication of the information was sufficiently analogous to defamation to find Article III standing satisfied. *Id.* at 1154 ("the Consumers submitted evidence that TransUnion's assessment of their creditworthiness took into account whether a debt was disputed or not.").

This is exactly the type of dissemination of harmful and misleading information that occurred here: BANA published misleading, incomplete, and inaccurate information to both Equifax and Trans Union in response to Plaintiff's disputes, when it provided ACDV responses that did not note that the accounts were disputed, continued to state that the accounts were

"Current" despite the reality that BANA's records showed no payment for nearly a decade, and failing to provide the date of first delinquency within the reporting.

ii.    _BANA Communicated Misleading And Harmful Information to Trans Union_

BANA's assertion that the information it disseminated to third party CRAs in response to Plaintiff's disputes was purportedly not harmful is contradicted by the evidence of record. With respect to the failure to mark the accounts as disputed, the harm is the dissemination of misleading and thus inaccurate information about a credit account to a third party. Failing to indicate that a consumer disagrees with a creditor's characterization of an account is misleading, and precisely why both the FCRA and FDCPA affirmatively require that disputes be communicated to CRAs. _Ewing_, 24 F. 4th at 1153 (discussing consumer protection purpose of FDCPA requirement at issue); _Seamans v. Temple Univ._, 744 F.3d 853, 867 (3d Cir. 2014) (failure to include notation of dispute can render furnisher's communication of information materially misleading under FCRA).

With respect to the failure to investigate and provide a date of first delinquency,



(Prindes 4/10/19 Dep. at 11:12-13:4, 105:11-107:13, 108:5-21, 111:22-112:15).

---

[4] Despite BANA's arguments, the importance of removing obsolescent accounts from a credit report is also demonstrated by the fact that obsolescence rules have been explicitly addressed by the FTC repeatedly. 55 FR 18804 (1990); August 31, 1998 letter, Exhibit C to Second Amended Complaint; June 4, 1999 letter, Exhibit D to Second Amended Complaint; February 15, 2000 letter, Exhibit E to Second Amended Complaint.

Further, BANA's argument that Plaintiff has failed to show specific dissemination of the adverse information is belied by the evidence. ███████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████ ECF 225-4 at pp. 2-16

Ex. 25); ECF 225-3 at p. 50 (Ex. 18, ███████████████████████████████

As a result, of BANA's adverse dissemination, Plaintiff's expert has opined that Konig's creditworthiness was diminished, and that his credit score decreased, since the BANA "Adverse" accounts continued to reside in Plaintiff's credit file. Ex. 33 attached to Soumilas Reply Decl., Expert Report of Tom Tarter ("Tarter Report") at pp. 41, 43; Ex. 34 attached to Soumilas Reply Decl., Tr. of Deposition of Tom Tarter ("Tarter Dep.") at 95:7-96:8.

BANA seeks to analogize this case to the identical issues raised in *Artemov v. Trans Union, LLC*, 2020 WL 5211068 (E.D.N.Y. Sept. 1, 2020) and *Cohen v. Experian Information Solutions, Inc*, 2021 WL 413494, at *1–2 (E.D.N.Y. Feb. 5, 2021), but those cases are entirely distinguishable – as the courts acknowledged, the asserted inaccuracy (a lower outstanding balance than in fact existed) would have made the plaintiff's credit score *better*. Here, Plaintiff has presented evidence that BANA's failure to correct its reporting lowered his creditworthiness and credit score by allowing the *adverse history* to report longer than allowed by law. Ex. 33, Tarter Report at pp. 41, 43; Ex. 34, Tarter Dep. 95:7-96:8. Having four more "adverse" credit accounts on one's credit file is harmful, a harm caused to Plaintiff by BANA's misleading communications to the CRAs.

b. <u>Plaintiff Has Presented Sufficient Evidence Of Class Standing</u>

As discussed above, BANA misreads applicable law on Article III standing, which makes clear that a furnisher's allegedly improper provision of harmful information to a CRA is sufficient to find Article III standing satisfied. *Ewing*, 24 F. 4th at 1152-54. There is no question that BANA communicated the improper reinvestigation responses to CRAs in response to class member

disputes: ███████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████ ECF 225-3 at pp. 3, 6, 10, 12.  The dissemination of these improper and harmful

responses to CRAs is sufficient to find at the class certification stage that all class members are

likely to have Article III standing. *Denney*, 443 F.3d at 263.

3. *Plaintiff And All Class Members Have The Same Well-Recognized Section 1681s-2(b) Claim*

BANA's purported "statutory standing" argument is not a standing argument at all, but

rather an attempt by BANA to improperly seek summary judgment at the class certification stage.

Whether a consumer may properly bring a claim for failure to mark an account as disputed is a

merits question not suited for resolution at this stage, and in any event is a common and

predominating question that can be resolved in a single stroke for all members of the BANA Class.

BANA's argument nevertheless fails because it misreads 15 U.S.C. § 1681s-2, the FCRA

section that defines the duties of companies that furnish information to CRAs which indisputably

includes BANA.   Section 1681s-2 has two distinct subsections: 1681s-2(a), which deals with the

"[d]uty of furnishers of information to provide accurate information," and 1681s-2(b), which

separately addresses the "[d]uties of furnishers of information upon notice of dispute" when the

furnisher receives notice of a consumer's dispute made to a CRA.  15 U.S.C. § 1681s-2(a), (b).  As

BANA points out, section 1681s-2(a) contains language requiring the furnisher to mark accounts

as disputed, but the full text of the provision makes clear that the disputes addressed therein are

disputes made *directly to the furnisher*, and not those made through a CRA:

> If the completeness or accuracy of any <u>information furnished by any person</u> to any <u>consumer reporting agency</u> is disputed **<u>to such person</u>** by a consumer, the person may not furnish the information to any consumer reporting agency without notice that such information is disputed by the consumer.

15 U.S.C. § 1681s-2(a)(3) (emphasis added). In this subsection, and throughout section 1681s-2, "person" refers to the furnisher; thus, it is clear that this section addresses only disputes made directly to the furnisher. Plaintiff does not contest that there is no private right of action under FCRA section 1681s-2(a), including for a furnisher's failure to notify a CRA of a consumer's dispute made directly to the furnisher; nor does he bring a section 1681s-2(a) claim.

But the case at bar does not address disputes made directly to BANA. Rather, Plaintiff's claim here is based solely on BANA's actions following receipt of notice of consumer disputes made *through consumer reporting agencies* in ACDVs. A furnisher's duties upon receipt of notice of a dispute made to a CRA are separately addressed in section 1681s-2(b), the claim at issue here.

Courts across the country, including the U.S. Courts of Appeal for the Third, Fourth, Sixth, and Ninth Circuits, have found that a furnisher's failure to mark an account as disputed following a consumer's dispute submitted to a CRA is a violation of FCRA section 1681s-2(b) that the consumer may enforce through a private cause of action. *Seamans v. Temple Univ.*, 744 F.3d 853, 866-67 (3d Cir. 2014); *Boggio v. USAA Fed. Sav. Bank*, 696 F.3d 611, 618 (6th Cir. 2012); *Gorman v. Wolpoff & Abramson, LLP*, 584 F.3d 1147, 1163 (9th Cir. 2009); *Saunders v. Branch Banking & Tr. Co. of Va.*, 526 F.3d 142, 152 (4th Cir. 2008).[5]

*Longman v. Wachovia Bank, N.A*, 702 F.3d 148 (2d Cir. 2012) is not to the contrary, as it did not involve a claim that the furnisher failed to mark an account as disputed following a dispute to a CRA. *Id.* At 150. Indeed, in *Longman*, in contrast to the case at bar, the only consumer dispute was submitted directly to the furnisher defendant, and thus the only possible claim could have arisen under section 1681s-2(a) for which there is no private right of action. *Id.* By contrast here,

---

[5] *Scheel-Baggs v. Bank of Am.*, 575 F. Supp. 2d 1031, 1039 (W.D. Wis. 2008); *Van Veen v. Equifax Information*, 844 F. Supp. 2d 599, 606 (E.D. Pa. 2012); *Gissler v. Pennsylvania Higher Education Assistance Agency*, No. 16-CV-1673, 2017 WL 4297344, *3-5 (D. Colo. Sept. 28, 2017).

Plaintiff made his disputes through the CRAs to BANA, and the only cause of action he brings is under section 1681s-2(b), for which there is unquestionably a private right of action.[6]  Plaintiff and all members of the BANA class have the same claim: that BANA's response to their indirect disputes via ACDVs was improper under section 1681s-2(b) because it did not mark the accounts as dispute in its responses to the CRAs.  Whether or not this claim will succeed on the merits, it is surely a common and predominating question which warrants class treatment.

4.  *Plaintiff Is A Typical And Adequate Representative Of The BANA Class*

BANA's combined challenge to typicality and adequacy, centering around differences between the dispute codes assigned to Plaintiff's indirect disputes, and the dispute codes used for purposes of class identification, is simply a red herring. First, Plaintiff is not required to be identical to other class members. *Annunziato v. Collecto, Inc*., 293 F.R.D. 329, 337 (E.D.N.Y. 2013). Second, the dispute codes chosen in this case for class identification purposes were limited to those codes for which a reasonable investigation would have inevitably required a review and determination that a date of first delinquency should be provided by BANA. Any dispute for the codes identified (Equifax 007, 016, 066, Trans Union F5, F6) are all intrinsically tied to the amount of time that an account has been in a delinquent status and the status of the account as delinquent. Therefore, a thorough and reasonable investigation into *any* one of these dispute types would have required that BANA investigate whether the date of delinquency reported was accurate. *See Myers v. Am. Educ. Servs.*, No. 1:18-cv-144, 2021 WL 859537, at *7 (S.D. Ohio Mar. 8, 2021) ("date of last payment, date closed, account status, payment rating, and account history — are intrinsically

---

[6]  As discussed above, the duty to mark an account as disputed under section 1681s-2(a)(3) arises only upon a consumer's direct dispute to a furnisher.  Thus, the statement by the court in *Tescher v. Experian Info Sols., Inc.* that a challenge to a furnisher's behavior upon notice of a dispute *from a CRA* was "specifically enumerated under § 1681s-2(a)" is a clear error of law, and one this Court should disregard.  *Tescher v. Experian Info. Sols., Inc.,* 2022 WL 564048, at *6 (S.D.N.Y. Feb. 23, 2022). *Lichtman v. Chase Bank USA*, NA, 2020 WL 1989486, at *6–7 (S.D.N.Y. Apr. 27, 2020) is doubly distinguishable: first because the plaintiff submitted a direct dispute to the furnisher, and second because the evidence showed, unlike here, that the furnisher did in fact mark the account as disputed.  *Id.* at *6.

tied to the balance owed" thus putting data furnisher on sufficient notice to require investigation of outstanding balance reported).

████████████████████████████████████████████████

████████████████████████████████████████ ECF 225-1 at p. 186, 188 (Chromiak 8/26/19 Dep. at 13:8-16:2, 23:19-24:1; *id.* at p. 79 (Lockaby Dep. at 119:6-120:9). BANA plainly applied the same common course of conduct to Plaintiff and all members of the proposed BANA Class, and typicality is clearly satisfied. *Barrows v. Becerra*, 24 F.4th 116, 131 (2d Cir. 2022) (affirming that typicality "is satisfied when each member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability.").

BANA asserts that Plaintiff has not met his burden with respect to adequacy, but simply ignores the citation to Plaintiff testimony making clear that he understands the case, his role as class representative, and lack of conflict with the interests of absent class members. ECF 223 at p. 19.[7] BANA cites no authority for the proposition that a class representative must provide a declaration regarding his adequacy rather than testimony, because none exists.

BANA's efforts to manufacture "unique defenses" rendering Plaintiff inadequate are nothing more than repetitions of its flawed arguments regarding Plaintiff's standing and its misreading of its obligations under FCRA section 1681s-2. As discussed in detail above, Plaintiff clearly has Article III standing for his claims against BANA, and the same evidence showing his standing will be used to show Article III standing for absent class members. Far from being "unique" defenses, they are common legal questions that will drive class-wide resolution.

---

[7] Second Circuit precedent holds that adequacy is presumed satisfied "*unless* plaintiff's interests are antagonistic to the interest of other members of the class." *Sykes v. Mel S. Harris & Assoc. LLC*, 780 F.3d 70, 90 (2d. Cir. 2015) (emphasis added) (internal quotations omitted). Plaintiff has asserted that no conflict of interest exists (ECF 223 at p. 19), and thus such conflict would be for BANA to prove, which it has not.

Similarly with respect to BANA's assertion that a dispute notation was not required under the FCRA or BANA's internal policies – these arguments ignore the clear evidence that ███

███████████████████████████████████████████████████████████████████████████████

███████████ ECF 225-1 at p. 99 (Lockaby Dep. at 199:4-200:13); ECF 225-3 at pp. 6, 13 ██

███████████████████████████████ While BANA argues that no dispute notation was required because Plaintiff never requested that a "permanent dispute notation" be placed and therefore Plaintiff's disputes were not "meritorious or bona fide," no court has held that a dispute notation must only be placed after an express request for a permanent notation. *See supra* p. 14 & n.5

Even further, because each dispute made by Plaintiff and each class member by definition relates specifically to the obsolete status of the account (through the disputes codes specifying that the consumer was disputing the date of first delinquency, account status, etc.), and every class member's tradeline was in fact obsolete, there is no unique defense that such disputes aren't meritorious or bona fide. In fact, BANA made no effort to determine whether consumers' disputes were "meritorious or *bona fide*" before applying the uniform reinvestigation procedures here - an approach that is consistent with the usual and regulatory construction of the FCRA, which presumes that consumer disputes to CRAs are *bona fide*. 40 Years of Experience with the Fair Credit Reporting Act, Federal Trade Commission, 2011 WL 3020575, at *69.

In reality, BANA conducted no investigation at all to locate a date of first delinquency following Plaintiff's dispute or that of any other class member despite its obligation to do so under 15 U.S.C. § 1681s-2(a)(5)(A) and *Seamans v. Temple Univ.*, 744 F.3d 853, 863 (3d Cir. 2014). ███

███████████████████████████████████████████████████████████████████████████████

███ ECF 239-8 (BANA Ex. L); ECF 225-1 at p. 187 (Chromiak 8/26/19 Dep. at 19:13-18). Thus,

BANA's purported "unique defense" could apply to all proposed class members, making it yet another common issue to be resolved on a class wide basis.

Plaintiff has satisfied the typicality and adequacy requirements of Rule 23.

5.  *Common Issues Predominate With Respect To The BANA Class*

BANA's arguments regarding predominance simply repeat its failed assertions regarding the class definition and Article III standing addressed in detail above. ███████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████ ECF 225-1 at p. 99 (Lockaby Dep. at 199:4-200:13); ECF 225-3 at pp. 6, 13. Whether any consumer subjectively continued to consider the account disputed is irrelevant to the existence of a claim under section 1681s-2(b), and BANA provides no case law that holds the consumers subjective intent is a necessary element to any claim under 1681s-2(b).  Whether evidence of objective consumer intent is required to prove a section 1681s-2(b) claim for failure to mark an account as disputed is a common merits question which will drive resolution of this case.

With respect to the BANA Subclass, ████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████ ECF 225-3 at p. 13 (Ex. 17 at Resp. to Rog. 20); ECF 225-1 at p. 187 (Chromiak 8/26/19 Dep. at 19:13-18).  This is uniform evidence of harmful dissemination. *Seamans*, 744 F.3d at 863.

BANA seeks to create individualized issues through the presentation of a hypothetical dispute "regarding the payment history" which may have asserted that a consumer in fact had made payments at some point and brought the account current.  ECF 241, BANA Opp. at pp. 23-24.  This argument fails for two reasons. ████████████████████████████

███████████████████████████████ BANA has failed to come forward with a single dispute record showing that this scenario is anything more than hypothetical.[8]  BANA's bare speculation is an insufficient basis to defeat class treatment, particularly since it could have presented actual evidence if it existed. Second, this ignores the evidence that Plaintiff has put forward showing that rather than disputing "the payment history" generally, ████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████ ECF 225-2 at pp. 113-130 (Exs. 14-15); ECF 225-2 at p. 141 (Prindes 6/11/21 Dep. at 35:11-37:5; ECF 225-3 at pp. 6, 10, 12-13 (Ex. 17).  This excludes the scenario BANA imagines.

Even if there are individualized questions in this case, the predominating questions that will drive resolution of this case are common: whether the standardized procedures BANA deployed are in violation of FCRA section 1681s-2(b), and whether such violations were willful.

B.  The Trans Union Class Should be Certified

Like BANA, Trans Union expends the majority of its opposition to class certification making arguments that go to the merits of the FCRA claim alleged, and to mischaracterizing applicable law on Article III standing, not to the Rule 23 questions at issue in this motion.  Because the issues Trans Union raises regarding obsolesce and publication will be resolved through reference to uniform legal arguments and objective evidence in Trans Union's possession, highlighting them only serves to prove that certification of the Trans Union Class is warranted.

---

[8]  Hypothetical arguments without evidence are insufficient to defeat class certification. *George v. Shamrock Saloon II LLC*, 2019 WL 8106153, at *10 (S.D.N.Y. Aug. 7, 2019), *report and recommendation adopted at* 2020 WL 133621 (S.D.N.Y. Jan. 13, 2020).

Because Trans Union cannot substantively oppose class certification under Rule 23 principles, it simply seeks to rewrite them, asserting that Plaintiff must provide class-wide evidence of standing, *and* sufficient class-wide evidence to prevail on the merits, now at the class certification stage. Rule 23 is not so exacting as Trans Union claims. All Plaintiff must do at this stage (with this motion and the page limitations for it) is show that standing and merits questions can be resolved through class-wide evidence. And the evidence here shows that Plaintiff can put on his merits case, including his theory of obsolescence and publication of such obsolete records to third parties, through objective evidence in Trans Union's possession.

1. *Plaintiff Has Presented Uniform Evidence Supporting His Theory of Obsolescence*

As Plaintiff's opening motion for class certification makes clear, he asserts that a tradeline on a consumer report is objectively obsolete when the last payment date is more than seven-and-a-half years prior to the date of the report, and the only available payment history is solely delinquent. Once Trans Union's mischaracterizations of Plaintiff's arguments and of applicable FCRA provisions are dispensed with, it becomes clear that these legal theory presents common and predominating questions that will drive resolution of this case.

The text of the FCRA does not define a particular Metro-2 field as the beginning and end of the obsolescence inquiry, as Trans Union suggests. *See* ECF 253, Trans Union Opp. at p. 3. Rather, section 1681c(c)(1) says obsolescence is calculated "beginning on the date of the commencement of the delinquency[.]" The payment history on the account, including the last payment date, also bear on identifying when a delinquency began. Plaintiff is not, as Trans Union suggests, trying to simply substitute "last payment date" for date of last delinquency. Rather, Plaintiff's assertion, which is the same for all class members, is that because of the objective conflict between a last payment date of more than seven-and-a-half years prior and a solely

20

delinquent payment history, Trans Union was on notice that the tradelines at issue were objectively obsolete.

Furthermore, Plaintiff asserts that because of the objective conflict between such a scenario and a pay status of "current," Trans Union was on notice that BANA's reporting was inaccurate and had an obligation to investigate further before including the inaccurate record on a report to a third party. Under this theory of liability, tradelines meeting the profile set forth in the definition of the Trans Union Class, including Plaintiff's, are all obsolete.

Trans Union argues that Plaintiff's accounts only became obsolete when BANA corrected the date of last payment in 2018, but this is factually incorrect. Given that there is no evidence that Plaintiff ever made any payments after February 2009, Plaintiff's accounts were obsolete within the meaning of the FCRA in August 2016, seven-and-a-half years later. ████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████ ECF 225-3 at p. 22; ECF 225-1 at pp. 239-40, 246-

47 (4/10/19 Prindes Dep. at 77:22-78:9, 105:11-107:13, 108:5-21); ECF 225-4 at pp. 60-61.

---

[9] ████████████████████ ECF 225-1 at p. 288-89, 295 (Chromiak 7/3/19 Dep. at 15:2-16:23, 17:12-18:20, 43:3-44:2); *id.* at pp. 236, 250-51(Prindes 4/10/19 Dep. at 62:9-23, 121:5-122:3). ████████████ ████████████████████████ ECF 225-1 at pp. 66, 103 (Lockaby Dep. at 65:17-66:7; 214:6-22, 215:10-23). ████████████ ████████████ ECF 225-1 at p. 237 (Prindes 4/10/19 Dep. at 66:23-67:12).

Trans Union seems to argue that it is entitled to rely solely on the "Pay Status" field (*e.g.*, "current" rather than having a date of first delinquency) when calculating obsolescence, but this argument fails both because there is no support in the FCRA or case law for such a proposition, and also because it is a merits argument that can be answered in a single stroke for all class members, and is thus not a basis to deny class certification. Because every single class member has the same payment status field, and the same delinquent account history in all payment history data through the date of last payment, each class member is identical in their respective credit reporting.

And contrary to Trans Union's assertion, Plaintiff does not ignore the fact that BANA verified in 2018 that the accounts had a "current" status as of 2012. Plaintiff's evidence demonstrates that this reporting was not only inaccurate (since he never made any payments since February 2009), but *objectively inaccurate*, ███████████████████████████████████

███████████████████████████████████████████████████████

███  *See* ECF 223 at p.11 ███████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████  ECF 225-3 at p. 22.

████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████  ECF 225-3 at p. 50 (Ex. 21). And Trans Union admits that "Adverse information is defined as anything that a potential creditor may consider to be negative when making a credit-granting decision."[10] Consistent with Trans Union's own assessment of the "Adverse" information it publishes, Plaintiff's expert opined that the reporting of two additional

---

[10]  https://www.transunion.com/customer-support/faqs/credit-basic#:~:text=If%20accounts%20do%20not%20contain,making%20a%20credit%2Dgranting%20decision.

adverse accounts damages credit score, and more importantly credit worthiness. Ex. 33, Tarter Report at pp. 41, 43; Ex. 34, Tarter Dep. 95:7-96:8.   The fact that Plaintiff was nonetheless able to obtain credit while these obsolete accounts appeared on his credit reports does not mean that he was not defamed by the publication of these legally obsolete and unreportable records.   In any event, the evidence regarding the class wide impact of reporting obsolete mortgage records will largely take the form of the expert reports already provided, and will be the same for all class members, demonstrating a common and typical injury. *Id.*

Trans Union seeks to challenge Plaintiff's class definition through a vague and incomplete hypothetical it posed during discovery.  ECF 253, Trans Union Opp. at pp. 16-17 (citing Pl.'s Resp. to Trans Union Interrogatory 26).  But Plaintiff's answer is not the silver bullet Trans Union claims, given that the hypothetical situation is excluded from the class proposed here, by the simple fact that it does not meet the same profile as Plaintiff's, with a facial conflict between the last payment date, solely derogatory payment history, and (absent from the hypothetical) a reported "Current" status. ECF 253-10 at p. 3. Specifically, credit reporting records show that the credit card was brought current on the date of last payment in 2010 and continued to be current until 2014, it did not have a solely delinquent status for the seven-and-a-half year period prior to 2020, and is therefore excluded from the class definition. The same explanation limits Trans Union's other hypotheticals such as "loan forgiveness" or "other agreement" which would not fall under the class definition.

Trans Union faults Plaintiff for not presenting evidence of "the historical status of the accounts for the entire period after the date of last payment" - but in the same breath concedes that it does not retain this evidence itself.  ECF 253 at pp. 17-18.  Plaintiff's argument is, as detailed above, that Trans Union was on notice of an objective conflict between the *available* and solely

derogatory payment history, date of last payment, and "current" status.  Trans Union's failure to keep complete records does not mean this conflict is any less present.

Trans Union may not agree that Plaintiff's showing is sufficient to demonstrate that the BANA accounts at issue were obsolete, but that disagreement with the merits of Plaintiff's claim is not a basis to deny class certification.[11]

## 2. *Publication Can Be Shown Through Objective Evidence In Trans Union's Possession*

Trans Union opposes class certification on the basis that Plaintiff is required to provide class-wide evidence that Trans Union published an obsolete tradeline to a third party in order for class certification to be proper.  ECF 253 at p. 13 (asserting without citation that publication is an element of Plaintiff's substantive claim).  This misstates the requirements of Rule 23, which simply require that Plaintiff demonstrate that such class-wide proof is feasible.  To require more would convert class certification proceedings into summary judgment on the merits, inconsistent with the Federal Rules and this Court's scheduling orders.  *See In re Initial Public Offering Sec. Litig.*, 471 F.3d 24, 41 (2d Cir. 2006) (courts have discretion to "assure that a class certification motion does not become a pretext for a partial trial on the merits."); *In re Kind LLC "Healthy & All Natural" Litig.*, 337 F.R.D. 581, 593 (S.D.N.Y. 2021) ("[R]esolution of a class certification motion should not become a preliminary inquiry into the merits of the case[.]").

Plaintiff has demonstrated that proof of third-party publication that establishes class membership (and Article III standing, as discussed further below) can be established through an objective review of Trans Union's own records.  *In re Petrobras Sec.*, 862 F.3d 250, 260 (2d Cir.

---

[11]   Trans Union dismisses Plaintiff's section 1681e(b) accuracy claims as irrelevant, but in reality the claims are intertwined:  it was inaccurate for the mortgage accounts to be reported as "current," as the evidence here clearly shows that Plaintiff was in a solely delinquent status since 2009. And it was this inaccurate "current" notation that caused the accounts to continue to report despite being outdated, harming class members' credit. Further, every credit report that contains obsolete information is misleading because it appears that the consumer has additional adverse accounts, when in reality, those accounts should not be reported at all. *See Houston v. TRW Info. Servs., Inc*., 707 F. Supp. 689, 693 (S.D.N.Y. 1989) (reporting obsolete accounts can present violation of 1681e(b)).

2017) (implied requirement of ascertainability means it must be feasible to identify class members).

This factor requires that "the identity of class members must be reasonably ascertainable by

reference to objective criteria." *Ebin v. Kangadis Food Inc.*, 297 F.R.D. 561, 566 (S.D.N.Y. 2014)

(ascertainability requirement is "not demanding" and simply requires that class members can be

determined "by reference to objective criteria."). The need to conduct an analysis of multiple

objective data elements does not defeat ascertainability or otherwise run afoul of Rule 23's

requirements. *See Kelly v. RealPage, Inc.*, ___ F. 4th ___, 2022 WL 3642113, at *17 (3d Cir. Aug.

24, 2022) (a "straightforward 'yes-or-no' review of existing records to identify class members is

administratively feasible even if it requires review of individual records with cross-referencing of

voluminous data from multiple sources… and does not require the sort of mini-trial or

individualized fact-finding" that defeats class treatment).

There is no serious question that the data needed to determine whether a consumer report

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████     ECF 225-1 at pp. 153-55, 159 (Garst Dep. at 46:8-17, 47:12-20, 48:25-

49:12, 51:1-12, 52:9-21, 55:10-17, 70:6-71:7). ██████████████████████████

███████████████████████████████████████████████████

The fact that manual review may be required is not a barrier to class certification, so long

as the review is objective. Courts have no problem certifying class actions where some degree of

ministerial manual review is required. *See Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 539

6th Cir. 2012 (need for manual review not a basis to deny class certification); *McKeage v. TMBC,*

*LLC*, 847 F.3d 992, 999 (8th Cir. 2017) (affirming class certification where court had required

counsel "to hire reviewers to manually inspect each" customer file*)*; *Souter v. Equifax Info. Servs.,*

*LLC*, 307 F.R.D. 183, 197 (E.D. Va. 2015) ("The individualized fact-finding giving rise to mini-

trials that defeat ascertainability are those requiring determinations on the merits—not an administrative review to determine whether an objective element of a class definition is met.") (citing *In re Vitamin C Antitrust Litig.*, 279 F.R.D. 90, 116 (E.D.N.Y. 2012)).

Given that there are less than 700 individuals for whom publication evidence will need to be reviewed, Trans Union's argument that class member identification would be too difficult or burdensome rings hollow. The claims of burden are further undermined by Trans Union's status as one of the largest CRAs in the United States, a sophisticated data company whole entire business model depends on "gathering and distilling information from a wide variety of sources in order to glean insights about individuals[.]" *Soutter*, 307 F.R.D. at 198-99.

To the extent that Trans Union's records are maintained in a way that makes identifying proof of publication more difficult, class members should "not be made to bear the cost of the [defendant's] faulty record keeping." *Hargrove v. Sleepy's, LLC*, 974 F.3d 467, 482 (3d Cir. 2020); *Kelly*, 2022 WL 3642113, at *16.[12]

The process Plaintiff has set forth requires only a ministerial inspection of Trans Union's records, which unquestionably establish whether Trans Union delivered a consumer report to a third party regarding a consumer who meets the same profile as Plaintiff. This is all that is required to show that the class definition is ascertainable and sufficiently cohesive for Rule 23 purposes.

3. *The Elements of Rule 23 Are Satisfied*

Trans Union, like BANA, addresses only a small portion of its opposition to Rule 23 factors, and in those simply repeats its failed merits arguments and mischaracterization of Plaintiff's claims.

___

[12] Notably, both *Kelly v. RealPage* and *Hargrove* were decided under the Third Circuit's heightened standard for ascertainability, which requires a showing of administrative feasibility, an approach the Second Circuit has explicitly rejected. *In re Petrobras*, 862 F.3d, 265. Plaintiff's showing of objective feasibility meets this heightened standard, and certainly the Second Circuit's less demanding standard as well. *See also, e.g.*, *Goldemberg v. Johnson &Johnson Consumer Cos., Inc.*, 317 F.R.D. 374, 398 (S.D.N.Y. 2016) (cautioning against constrained application of ascertainability requirement in consumer class actions).

Trans Union is simply mistaken that Plaintiff has not presented evidence of common procedures: ███████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████    ECF 225-1 at pp. 223, 239-40, 246-48, 256-57 (Prindes 4/10/19 Dep. at 11:12-13:4, 77:22-78:9, 105:11-107:13, 108:5-21, 111:22-112:15 142:24-143:6, 147:14-148:22). ████████

████████████████████████████████████████████████████████

██████████████████████████████████    ECF 225-4 at p. 41 (Ex. 27).   Plaintiff brings the same claim on behalf of all of these individuals, based upon the same legal theory of obsolescence discussed above. This is more than enough to establish commonality and predominance. *Comer v. Cisneros*, 37 F.3d 775, 796-97 (2d Cir. 1994). *Romero v. La Revise Assocs., L.L.C.*, 58 F. Supp. 3d 411, 419 (S.D.N.Y. 2014) (predominance is "satisfied where plaintiffs are 'unified by a common legal theory.'" (quoting *McBean v. City of New York*, 228 F.R.D. 487, 502 (S.D.N.Y.2005)).

Furthermore, the need for ministerial review of Trans Union's publication records to determine an objective, binary fact (was the tradeline meeting the class definition delivered to a third party – yes or no?) is not the type of factual determination that defeats class treatment. *See Harte v. Ocwen Fin. Corp.*, 2018 WL 1830811, at *34 (E.D.N.Y. Feb. 8, 2018), *report and recommendation adopted*, 2018 WL 1559766 (E.D.N.Y. Mar. 30, 2018) (finding predominance satisfied and certifying class even where laborious, multi-step review process needed to identify class members, because "[r]egardless of the class members' individual circumstances" the case presented questions of law "that would apply equally to all members across the board.").

Foundationally, the class certification determination is a pragmatic one, focused on whether centralized adjudication of liability questions will yield efficiencies of time and resources.  When,

as here, a class is "allegedly aggrieved by a single policy of defendants, . . . the case presents precisely the type of situation for which the class action device is suited since many nearly identical litigations can be adjudicated in unison." *In re Nassau Cty. Strip Search Cases*, 461 F.3d 219, 228 (2d Cir. 2006) (citation, quotation marks omitted); *see also* 2 W. Rubenstein, Newberg on Class Actions § 4:54 (5th ed. Dec. 2021). This is precisely such a case, and the proposed Trans Union Class should be certified.

4. *Plaintiff Has Made A Sufficient Showing Of Article III Standing At This Stage*

As discussed above, Trans Union misstates the applicable legal standard when it argues that Plaintiff must "establish" through the class definition that Trans Union reported obsolete information to a third party – all Plaintiff must do at this stage is show that he can identify a class and present his merits argument through reference to common evidence.  The same applies with respect to Plaintiff's burden with respect to Article III standing at the class certification stage. Second Circuit precedent is clear that individual evidence of standing is not required.  *Denney v. Deutsche Bank AG*, 443 F.3d 253, 264 (2d. Cir. 2006).

Trans Union substantially mischaracterizes the U.S. Supreme Court's recent decision in *TransUnion, LLC v. Ramirez*, 141 S.Ct. 2190 (2021).  *TransUnion* does not stand for the proposition that a plaintiff must present class-wide evidence of "downstream consequences" for a statutory violation at the certification stage.  The *TransUnion* decision was limited to a post-trial determination of which members of a certified class could recover statutory damages, and as discussed above, reaffirmed prior Supreme Court precedent making clear that the burden of proof for standing evolves in accordance "with the manner and degree of evidence required at the successive stages of the litigation." 141 S.Ct. 2208 (quoting *Lujan*, 504 U.S. at 561).

Furthermore, the "downstream consequences" language on which Trans Union seeks to now rely addresses a different type of FCRA statutory violation not at issue in this case – a claim

that Trans Union failed to provide a clear and properly formatted disclosure document, where there was no evidence that the information improperly disclosed was ever sent to a third party. 141 S.Ct. at 2213-14.  The opposite is true here: the Trans Union class is defined to include only those consumers about whom Trans Union disseminated a report to a third party.  Tellingly, Trans Union ignores the fact that the Supreme Court also addressed one of the two claims Plaintiff now brings – an assertion that Trans Union reported harmful and legally not reportable information about him to a third party.  In such a situation, the Supreme Court made clear that such a report causes a harm akin to defamation, and did not require any further proof to find Article III standing satisfied.  1441 S.Ct. at 2209-10.  *See* Ex. 33, Tarter Report at pp. 41, 43; Ex. 34, Tarter Dep. 95:7-96:8.[13]

Even the cases Trans Union itself cites, *Grauman* and *Zlotnick*, make clear the *dissemination* of negative information, including a credit score lowered through inclusion of improper information, is sufficient to find standing – indeed, in both cases, unlike Plaintiff and the proposed Trans Union Class here, no credit report containing the information impacting credit score had been disseminated. *Grauman v Equifax Info. Servs., LLC*, 549 F. Supp. 3d 285, 291-92 (E.D.N.Y. 2021) (finding no standing because credit report containing the information at issue had been sent to a third party); *Zlotnick v. Equifax Info. Servs., LLC*, No. 21CV7089GRBJMW, 2022 WL 351996, at *2 (E.D.N.Y. Feb. 3, 2022) ("no actual dissemination is alleged").

Plaintiff here does not, as Trans Union claims, seek to represent class members for whom there was no publication – rather, as discussed above, he has set forth a feasible and objective review of Trans Union records (described by Trans Union itself, *see* ECF 225-4 at pp. 65-66 (¶¶ P-R)) ████████████████████████████

---

[13]  Notably, Trans Union does not seek to challenge Plaintiff's individual standing, likely because as noted above, Plaintiff is not the party that invoked Article III standing – Trans Union did.  ECF 1.  To the extent Trans Union is arguing that Plaintiff's individual standing is lacking, the appropriate remedy is remand to state court.

The only cases Trans Union cites for the proposition that after *TransUnion* a plaintiff must provide evidence of all class members' standing in order to certify the class undermine its argument here. *Nnebe v. Daus* directly contradicts Trans Union's argument, holding that "the Article III standing inquiry at the class certification stage focuses on the named plaintiffs, not the absent class members." *Nnebe v. Daus*, No. 06-CV-4991 (RJS), 2022 WL 1204700, at *2 (S.D.N.Y. Apr. 22, 2022). *Lackawanna Chiropractic P.C. v. Tivity Health Support*, LLC, No. 18-CV-649-LJV-JJM, 2021 WL 3827733, at *2 (W.D.N.Y. Aug. 27, 2021) likewise makes clear that at the class certification stage, passive class members need not 'submit evidence of personal standing[.]'"

Plaintiff has proposed a straightforward, objective method by which he will identify a class of consumers about whom Trans Union disseminated consumer reports containing records he asserts were obsolete and not reportable – that is all that Second Circuit authority on standing at the class certification stage requires.

## IV.    **CONCLUSION**

For the foregoing reasons, and the reasons set forth in his opening Motion for Class Certification Plaintiff Maurice Konig respectfully requests that this Honorable Court certify this matter as a class action.

DATED:   August 31, 2022                     Respectfully submitted,

MAURICE KONIG, *by his attorneys*,

*/s/John Soumilas*
James A. Francis*
John Soumilas*
Lauren KW Brennan*
FRANCIS MAILMAN SOUMILAS, P.C.
1600 Market Street, Suite 2510
Philadelphia, PA 19103
(215) 735-8600
jfrancis@consumerlawfirm.com
jsoumilas@consumerlawfirm.com
lbrennan@consumerlawfirm.com

Daniel Zemel, Esq.
Elizabeth Apostola, Esq.
Zemel Law LLC
660 Broadway
Paterson, New Jersey 07514
(862) 227-3106
dz@zemellawllc.com
ea@zemellawllc.com

## <u>CERTIFICATE OF SERVICE</u>

I, the undersigned attorney, hereby certify that the forgoing **REPLY MEMORANDUM IN FURTHER SUPPORT OF PLAINTIFF MAURICE KONIG'S MOTION FOR CLASS CERTIFICATION** was filed via the Court's Electronic Case Filing System which electronically notified all counsel of record.

Date:  August 31, 2022                    _/s/ John Soumilas_
                                                      John Soumilas