UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x

MAURICE KONIG,

                                    Plaintiff,                              **OPINION AND ORDER**

              -against-

TRANSUNION, LLC, EQUIFAX                                                    18 Civ. 7299 (JCM)
INFORMATION SERVICES, LLC,[1]
BANK OF AMERICA, N.A.,


                                    Defendants.
-----------------------------------------------------------------x

Plaintiff Maurice Konig ("Plaintiff") brought this action against Bank of America, N.A.

("BANA") and TransUnion, LLC ("TransUnion") (collectively, "Defendants") under the Fair

Credit Reporting Act, 15 U.S.C § 1681, *et seq*. ("FCRA") for allegedly reporting aged BANA

accounts for a period in excess of the maximum time allowed.[2]  Plaintiff now moves, pursuant to

Rule 23 of the Federal Rules of Civil Procedure, for class certification. (Docket No. 222).

Plaintiff's motion is accompanied by a memorandum of law, (Docket No. 224) ("Pl. Mtn."), and

a declaration with accompanying exhibits from Plaintiff's counsel, (Docket No. 226).

Defendants BANA and TransUnion each filed oppositions and accompanying declarations,

(Docket Nos. 240, 242, 252-53) ("BANA Opp'n" and "TransUnion Opp'n"), Plaintiff filed a

reply and accompanying reply declaration, (Docket Nos. 258-59) ("Pl. Reply"), and Defendants

each filed sur-replies, (Docket Nos. 263, 266) ("BANA Sur-Reply" and "TransUnion Sur-

---

[1] On June 2, 2022, the Court so-ordered the stipulation of dismissal with prejudice, pursuant to Fed. R. Civ. P. 41(a), of Plaintiff's claims against Defendant Equifax Information Services, LLC. (Docket No. 236).

[2] This action is before this Court for all purposes on the consent of the parties, pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. (Docket No. 42).

Reply"). For the reasons set forth below, the Court finds that Plaintiff lacks Article III standing to pursue his claims in federal court, and thus this Court lacks subject matter jurisdiction. Accordingly, Plaintiff's motion for class certification is denied as moot, and Plaintiff's case is remanded to state court.

## I. BACKGROUND

### A. Relevant Facts

### i. Plaintiff's Mortgage Loans

In 2006, Plaintiff bought four rental "properties in upstate New York where properties were cheaper" to "build up a business portfolio." (Docket No. 225-4, Pl. Dep. (Soumilas Decl., Ex. 32), at 19). Plaintiff obtained mortgage loans from Defendant BANA to finance these investment properties. (*Id.*; *see* Docket No. 104 (Second Am. Compl. ("SAC")) ¶ 18). In 2008 and 2009, Plaintiff defaulted on the four mortgage loans. (Docket No. 104 (SAC) ¶¶ 18-19; *see* Pl. Mtn. at 1).[3] In October 2012, BANA transferred Plaintiff's four mortgage loans to other servicers. (Docket No. 225-1, Chromiak Dep. (Soumilas Decl., Ex. 7), at 16-18). In 2012, sometime after the transfer, BANA began reporting to the credit reporting agencies ("CRAs") that Plaintiff's mortgage accounts had a payment rating of "current/pays as agreed" and did not have a date of first delinquency. (BANA Opp'n at 2). The purpose of this practice is to ensure that a consumer does not have two derogatory reporting marks for the same account(s). (*See* Docket No. 225-1, Expert Report of Oscar Marquis (Soumilas Decl., Ex. 2), at 14).

---

[3] A BANA customer's account becomes delinquent when the customer's payment is at least thirty days late, and is never brought current. (Docket No. 225-1, Lockaby Dep. (Soumilas Decl., Ex. 3), at 52-53). The "date of first delinquency" refers to the date which the account became delinquent. (*Id.* at 52). As a creditor, BANA furnishes information regularly to CRAs. (Docket No. 225-1, Garst Dep. (Soumilas Decl., Ex. 4), at 26).

**ii. Plaintiff's Credit Report and Disputes**

Plaintiff obtained a copy of his credit report in February 2018. (Pl. Mtn. at 10; Docket No. 225-3, TransUnion Disclosure (Soumilas Decl., Ex. 21)).  At that time, Plaintiff learned that his BANA accounts were still appearing on his credit report, even though he last made payments on those accounts in 2008 or 2009. (*Id.*).  In April 2018, Plaintiff disputed the information regarding these accounts with TransUnion. (Pl. Mtn. at 10; Docket No. 225-3, TransUnion Dispute Line Item (Soumilas Decl., Ex. 22)).[4]  Specifically, Plaintiff stated that each of the mortgages had errors with: "the date opened, the date first reporting and the dates of status." (Docket No. 253-5, Konig Letter to TransUnion (Hartmann Decl., Ex. D)).  Credit reporting agencies, like TransUnion, regularly receive information from data furnishers (*i.e.*, creditors) via a database. (*See* Docket No. 225-1, Prindes Dep. (Soumilas Decl., Ex. 6), at 7).  Creditors typically provide information regarding any changes to account information, including balances, payments, remarks, and ratings, on a monthly basis. (*See* Docket No. 225-3, TransUnion Disclosure (Soumilas Decl., Ex. 21); Docket No. 225-1, Prindes Dep. (Soumilas Decl., Ex. 6), at 61)).  That information is then incorporated into credit reports and consumer disclosures. (*See* Docket No. 225-1, Prindes Dep. (Soumilas Decl., Ex. 6), at 7-9).  When a consumer disputes the information in their credit report, CRAs, such as TransUnion, generally convey the nature of the

---

[4] Plaintiff also disputed the information with Equifax in June 2018. (Docket No. 225-3, Equifax Automated Consumer Dispute Verification (Soumilas Decl., Ex. 23)).

dispute to data furnishers, via the automated credit dispute verification ("ACDV") system. (*See id.* at 91-92).[5]

TransUnion reported Plaintiff's dispute to BANA using the ACDV system. (BANA Opp'n at 3; Pl. Mtn. at 10; Docket No. 225-3, TransUnion ACDV Report (Soumilas Decl., Ex. 24)). In response, BANA undertook an investigation following its standard policies and procedures,[6] and "instruct[ed] TransUnion to change the dates of last payment from November 23, 2012 to December 30, 2008 (for one account), and January 5, 2009 (for the other account)." (TransUnion Opp'n at 6; BANA Opp'n at 3; Docket No. 225-4, BANA TransUnion ACDV Responses (Soumilas Decl, Ex. 25)). Accordingly, TransUnion updated the information in Plaintiff's accounts to reflect the updated payment date information received from BANA. (TransUnion Opp'n at 6). The account status of each of the four mortgages was left "current." (Docket No. 225-1, Expert Report of Oscar Marquis (Soumilas Decl., Ex. 2), at 4).

In August 2018, Plaintiff applied for, and received, an automobile loan to purchase a new car. (Docket No. 225-4, Pl. Dep. (Soumilas Decl., Ex. 32), at 39, 60; TransUnion Opp'n at 8). In connection with Plaintiff's application for the loan, Capital One Auto Finance pulled Plaintiff's

---

[5] The ACDV is an industry-standard dispute resolution system that CRAs use to convey consumer disputes to creditors. Specifically, CRAs transmit data currently on a consumer's credit report and ask the creditor to verify the information contained therein. (*See* Docket No. 104 (SAC) ¶¶ 42-44; *see also* Docket No. 225-1, Expert Report of Oscar Marquis (Soumilas Decl., Ex. 2), at 3).

[6] BANA has certain policies and standardized procedures in place to ensure compliance with FCRA and to respond to ACDVs. (Docket No. 225-1, Chromiak Dep. (Soumilas Decl., Ex. 7), at 11-12). These policies were in place and utilized by BANA in responding to Plaintiff's disputes, as provided to TransUnion and Equifax to BANA via ACDVs. (Docket No. 225-1, Expert Report of Oscar Marquis (Soumilas Decl., Ex. 2), at 4). When CRAs report disputes to BANA via the ACDV system, BANA employs a "multi-stage response process" to respond to consumer disputes. (*Id.* at 3). First, a BANA associate cross-references the ACDV data to the customer's BANA account history to look for discrepancies. (*Id.*). Second, the BANA associate then also compares the information in the ACDV against other information in "BANA's internal system of record." (*Id.*). Third, the associate must consider any images or documents (*e.g.*, a dispute letter) accompanying the ACDV before providing any response. (*Id.*). The BANA associate then replies to the ACDV by adding updated information, where warranted. (*Id.*). BANA's policies provide for a quality review performed by the relevant business lines within the bank. (*Id.*).

credit reports. (Docket No. 225-4, Decl. of Capital One Auto Finance in Resp. to Pl. Maurice
Konig's Third Party Subpoena (Soumilas Decl., Ex. 28), ¶ 4). That credit pull revealed Plaintiff's
Equifax and TransUnion credit scores, which Plaintiff testified were "excellent." (*See id.*; Docket
No. 225-4, Pl. Dep. (Soumilas Decl., Ex. 32), at 39). Moreover, Plaintiff's BANA mortgages
appeared on the credit reports. (Docket No. 225-4, Decl. of Capital One Auto Finance in Resp. to
Pl. Maurice Konig's Third Party Subpoena (Soumilas Decl., Ex. 28), ¶ 5). Plaintiff's application
for a car loan was subsequently approved. (*Id.* ¶ 6).

**B.  Procedural History and Plaintiff's Allegations**

Plaintiff filed suit in state court in July 2018. (Docket No. 1-2). In August 2018,
Defendant TransUnion removed the action to federal court based on federal question jurisdiction.
(Docket No. 1). Plaintiff originally pursued claims in his personal capacity. (*See* Docket Nos. 1-
2, 51). However, in 2019, Plaintiff sought leave to file a second amended complaint to add
certain factual allegations and to convert his individual action into a class action. (Docket Nos.
80, 81). On February 4, 2020, the Court granted Plaintiff's motion, finding that, accepting as
true all of the allegations in the second amended complaint, it was "likely" that Plaintiff's
proposed classes would "satisfy the requirements of Rule 23." *Konig v. TransUnion, LLC*, 18
Civ. 7299 (JCM), 2020 WL 550285, at * 5 (S.D.N.Y. Feb. 4, 2020). However, the Court
"caution[ed] the parties not to conclude that certification is a foregone conclusion because it is
'more appropriately addressed in the context of motions to certify the proposed classes.'" *Id.*
(quoting *Presser v. Key Food Stores Co-op, Inc.*, 218 F.R.D. 53, 57 (E.D.N.Y. 2003)). Plaintiff
filed the second amended complaint on February 14, 2020. (Docket No. 104).

In the second amended complaint, Plaintiff alleges that Defendants TransUnion and
BANA violated the FCRA by inaccurately reporting and furnishing Plaintiff's aged BANA

accounts for more than seven-and-a-half years past the date of delinquency, in violation of

Section 1681c(a)(4) of the FCRA. (Docket No. 104 (SAC) ¶¶ 82, 99-100).  Plaintiff also alleges

that TransUnion and BANA violated the FCRA by failing to mark his accounts as "disputed"

when responding to Plaintiff's challenge to his credit report via the automated credit dispute

verification ("ACDV") system.  *Id.* ¶¶ 84, 101.  In the second amended complaint, Plaintiff

proposed two nationwide classes and two New York-based subclasses who were allegedly

harmed by BANA and TransUnion's conduct and policies:

> **Class A**: All natural persons residing within the United States, beginning two years
> prior to the filing of this Complaint and continuing through the resolution of this
> action, whose Equifax and TransUnion credit reports contained an adverse BANA
> trade line with a date of last payment date that is more than seven years and seven
> months from the date of the reporting.
>
> **Subclass A**: All natural persons residing in the State of New York, beginning two
> years prior to the filing of this Complaint and continuing through the resolution of
> this action, whose Equifax and TransUnion credit reports contained an adverse
> BANA trade line with a date of last payment date that is more than seven years and
> seven months from the date of the reporting.
>
> **Class B**: All natural persons residing within the United States, beginning two years
> prior to the filing of this Complaint and continuing through the resolution of this
> action, on whose behalf a dispute was made to Equifax and TransUnion on an
> antedated adverse BANA trade line, after which Equifax, TransUnion and BANA
> verified the account as accurately reporting.
>
> **Subclass B**: All natural persons residing in the State of New York, beginning two
> years prior to the filing of this Complaint and continuing through the resolution of
> this action, on whose behalf a dispute was made to Equifax and TransUnion on an
> antedated adverse BANA trade line, after which Equifax, TransUnion and BANA
> verified the account as accurately reporting.

(*Id.* ¶¶ 61-77).

Following the filing of the second amended complaint, the parties engaged in nearly two

years of continued discovery regarding Plaintiff's anticipated motion for class certification and

newly added factual allegations. (*See* Docket No. 138 (Apr. 22, 2020 Scheduling Order)).  On

March 7, 2022, Plaintiff informed the Court that he was ready to proceed with Rule 23 class

certification briefing. (Docket No. 253-9, Mar. 7, 2022 Tr. (Hartmann Decl. Ex. H)).

**C. Plaintiff's Proposed Classes**

Plaintiff now seeks to certify two nationwide classes and one nationwide subclass of

"similarly situated consumers" with respect to his FCRA claims. (Pl. Mtn. at 4, 11).  As to

BANA, Plaintiff moves to certify:

> **BANA Class**: All consumers who, from February 14, 2018 and through final
> judgment in this matter, made a dispute to one or more consumer reporting agencies
> regarding the payment history of an adverse aged BANA credit account, to which
> BANA responded without marking the account as disputed.

> **BANA Subclass**: All consumers who, from February 14, 2018 and through final
> judgment in this matter, made a dispute to one or more consumer reporting agencies
> regarding the payment history of an adverse aged BANA credit account, and to
> which BANA responded to the dispute by permitting the account to continue
> reporting and did not provide any "date of first delinquency."

(*Id.* at 4).  Plaintiff has defined an "adverse aged account" to be "an account that has maintained

delinquencies from the date of last payment, either indefinitely, through date of transfer, or

through date closed… [and] the date of last payment shall be seven years and 7 months from said

reporting or dispute processing." (Docket No. 239-8, Zemel Letter (Smedley Decl., Ex. L)).

Plaintiff also moves to certify one TransUnion class:

> **TransUnion Class**: All consumers about whom, from February 14, 2018 and
> through final judgment in this matter, TransUnion disseminated a consumer report
> to a third party containing a BANA credit account with a status of "current," a "last
> payment" date more than seven-and-one-half years prior to the date of the report,
> and solely delinquent payment history within the available data.

(Pl. Mtn. at 4-5).

## II. DISCUSSION

### A. The FCRA

In 1970, Congress passed, and the President signed into law, the FCRA. *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2200 (2021) ("*Ramirez*").  The purpose of the FCRA is "to promote fair and accurate credit reporting and to protect consumer privacy…[by] regulat[ing] the consumer reporting agencies that compile and disseminate personal information about consumers." *Id.* (internal citation omitted).  The FCRA "creates a cause of action for consumers to sue and recover damages for certain violations." *Id.* at 2201.  The FCRA also delegates exclusive enforcement of certain specified subprovisions to governmental agencies. *See* 15 U.S.C. § 1681s.

Plaintiff here alleges that: (i) both TransUnion and BANA negligently and/or willfully violated the FCRA sections 1681c(a)(4)-(5) by reporting obsolete and "adverse" information on his credit report beyond the allowable period; (ii) TransUnion violated the FCRA sections 1681e(b) and 1681i by negligently and willfully failing to conduct a reasonable investigation and procedure in response to Plaintiff's dispute to ensure the accuracy of the information on his credit report; and (iii) BANA violated FCRA section 1681s-2(b) by failing to follow appropriate procedures upon receiving notice of Plaintiff's dispute from the CRAs.  (Docket No. 104 (SAC) ¶¶ 78-86, 97-105).

Sections 1681c(a)(4)-(5) provide that:

[N]o consumer reporting agency may make any consumer report containing any of the following items of information:
…

 (4) Accounts placed for collection or charged to profit and loss which antedate the report by more than seven years.

      (5) Any other adverse item of information, other than records of convictions of crimes which antedates the report by more than seven years.

15 U.S.C § 1681c(a)(4)-(5).  Pursuant to Section 1681c(c), the seven-year period "shall begin, with respect to any delinquent account that is placed for collection … charged to profit and loss, or subjected to any similar action, upon the expiration of the 180-day period beginning on the date of commencement of the delinquency which immediately proceeded the collection activity, charge to profit and loss, or similar action." *Id.* § 1681c(c)(1).  Under the FCRA, data furnishers have a duty to notify the CRAs of the date of delinquency on an account within 90 days of "a delinquent account being placed for collection, charged to profit or loss, or subjected to any similar action." *Id.* § 1681s-2(a)(5).

      Section 1681e imposes duties on CRAs to employ reasonable procedures to comply with the FCRA. *See id.* § 1681e.  Specifically, section 1681e(b) provides that "[w]henever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." *Id.* § 1681e(b).  Section 1681i, in turn, provides for specific procedures if the consumer disputes the accuracy of information in her credit report, including that a CRA generally must "conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate and record the current status of the disputed information." *Id.* § 1681i(a)(1)(A).

      Section 1681s-2(b) imposes duties on data furnishers, upon notice of dispute from a CRA, to: (i) conduct an investigation; (ii) review all relevant information provided by the CRA; (iii) report the results of the investigation to the CRA, and, if information was found to be incomplete or inaccurate, provide the results to all CRAs to which the furnisher provides information; and (iv) modify, delete, or permanently block information, for purposes of reporting

to CRAs, found to be inaccurate or incomplete, or that cannot be verified via reinvestigation. *See*

*id.* § 1681s-2(b).

**B. Class Certification Pursuant to Rule 23 of the Federal Rules of Civil Procedure**

Federal Rule of Civil Procedure 23(a) contains four "[p]rerequisites" for class

certification:

> (1) the class is so numerous that joinder of all members is impracticable;
> (2) there are questions of law or fact common to the class;
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).  If the prerequisites of Rule 23(a) are satisfied, the party must then

demonstrate that class certification is appropriate under Rule 23(b) by showing that: (1) common

questions of law or fact predominate over individual issues; and (2) that a class action is

"superior to other available methods for their fair and efficient adjudication of the controversy."

Fed. R. Civ. P. 23(b)(3).

**C. Standing**

"Federal courts are courts of limited jurisdiction" that "possess only that power

authorized by Constitution and statute." *Hendrickson v. United States*, 791 F.3d 354, 358 (2d Cir.

2015) (citation and internal quotations omitted).  Article III of the Constitution "confines the

federal judicial power to the resolution of 'Cases' and 'Controversies.'" *Ramirez*, 141 S. Ct. at

2203.  Article III standing is a "bedrock" requirement that "ensure[s] that a plaintiff has a

sufficiently personal stake in the outcome of the suit so that the parties are adverse." *W.R. Huff*

*Asset Mgmt. Co., LLC v. Deloitte & Touche LLP*, 549 F.3d 100, 106-07 (2d Cir. 2008).

"[F]ederal courts have an independent obligation to resolve any issue about their subject matter

jurisdiction *sua sponte*… [r]egardless of whether a defendant in a case under the Fair Credit

Reporting Act or the Fair Debt Collection and Reporting Act raises a standing issue." *Gross v.*

*TransUnion, LLC*, 607 F. Supp. 3d 269, 270 (E.D.N.Y. 2022).  Accordingly, as a threshold

matter, the Court must determine whether Plaintiff has standing to pursue claims on behalf of

himself and on behalf of the putative class members.  "[I]f none of the named plaintiffs

purporting to represent a class establishes the requisite of a case or controversy with the

defendant[ ], none may seek relief on behalf of himself or any other member of the class." *Cent.*

*States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 433

F.3d 181, 199 (2d Cir. 2005) (quoting *O'Shea v. Littleton*, 414 U.S. 488, 494 (1974)).

  Courts undertake a "bifurcated inquiry" to determine whether a plaintiff has standing to

pursue a class action. *Petrosino v. Stearn's Prod., Inc.,* No. 16-CV-7735 (NSR), 2018 WL

1614349, at *5 (S.D.N.Y. Mar. 30, 2018).  First, the proposed representative plaintiff must

establish Article III standing. *Gold v. Eva Nats., Inc.*, 586 F. Supp. 3d 158, 161 (E.D.N.Y. 2022).

Article III standing requires a plaintiff to establish: "(i) that he suffered an injury in fact that is

concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the

defendant; and (iii) that the injury would likely be redressed by judicial relief." *Ramirez*, 141 S.

Ct. at 2203 (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).  Second, a

plaintiff must establish that he has statutory class standing. *Gold*, 586 F. Supp. 3d at 161. "[A]

plaintiff has class standing if he plausibly alleges (1) that he personally has suffered some actual

... injury as a result of the putatively illegal conduct of the defendant…and (2) that such conduct

implicates the same set of concerns as the conduct alleged to have caused injury to other

members of the putative class by the same defendants[.]" *NECA-IBEW Health & Welfare Fund*

*v. Goldman Sachs & Co.,* 693 F.3d 145, 162 (2d Cir. 2012) (internal citations and quotations

omitted).  The Court conducts its Rule 23 class action analysis only after first making its

standing determination. *Gold*, 586 F. Supp. 3d at 161.  Plaintiff bears the burden of proving

standing by a preponderance of the evidence at the class certification stage. *See Pryce v.*

*Progressive Corp.*, No. 19-CV-1467 (RJD) (RER), 2022 WL 1085489, at *5, *11 (E.D.N.Y.

Feb. 17, 2022), *report and recommendation adopted as modified*, 2022 WL 969740 (E.D.N.Y.

Mar. 31, 2022).

**i.  Relevant Supreme Court and Second Circuit Precedent**

The parties' standing dispute centers on the Supreme Court's 2021 decision regarding

Article III standing in FCRA actions in *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190 (2021), and

its progeny.  These decisions were rendered after the Court's opinion and order granting

Plaintiff's motion to file the second amended complaint and add class allegations, and thus were

not discussed by the parties or analyzed by the Court at that juncture.

In *Ramirez*, the Supreme Court held that if a FCRA plaintiff fails to demonstrate a

concrete harm, she lacks constitutional standing; put simply, "No concrete harm, no standing."

*Id.* at 2214.  There, the named plaintiff sued TransUnion on behalf of a class of 8,185 consumers,

claiming that TransUnion violated the FCRA through its use of a system that flagged consumers'

credit reports as a "potential match" to a list of "specially designated nationals who threaten

America's national security" maintained by the federal government. *Id.* at 2201-02 (internal

quotations omitted).  Prior to trial, the parties stipulated that, of the total class of 8,185, "only

1,853 members of the class (including Ramirez) had their credit reports disseminated by

TransUnion to potential creditors." *Id.* at 2202.  The Supreme Court ultimately concluded that

only those 1,853 class members had constitutional standing. *Id.* at 2214.  The remaining 6,332

plaintiffs lacked standing because they:

did not demonstrate that the risk of future harm materialized—that is, that the inaccurate OFAC alerts in their internal TransUnion credit files *were ever provided to third parties or caused a denial of credit.* Nor did those plaintiffs present evidence that the class members were independently harmed by their exposure to the risk itself—that is, that they suffered some other injury (such as an emotional injury) from the mere risk that their credit reports would be provided to third-party businesses.

*Id.* at 2211 (emphasis added). Therefore, the Court found that "the 6,332 plaintiffs' argument for standing for their damages claims based on an asserted risk of future harm [was] unavailing." *Id.* Notably, the Court "d[id] not [] address the distinct question whether every class member must demonstrate standing *before* a court certifies a class." *Id.* at 2208, n.4.

Nevertheless, the Court provided the basic contours for purposes of assessing Article III standing in FCRA actions. The Court specified that, for Article III purposes, a concrete harm may exist where "the alleged injury to the plaintiff has a 'close relationship' to a harm 'traditionally' recognized as providing a basis for a lawsuit in American courts." *Id.* at 2204 (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016)). The Court further explained that "[v]arious intangible harms can also be concrete" provided that those injuries have a "close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts." *Id.* (collecting cases). While the Court left open the possibility that other emotional or psychological harms could potentially constitute "intangible harms" (so long as the Court could find a "historical or common-law analog"), such as the common law tort of intentional infliction of emotional distress, the plaintiffs in *Ramirez* did not argue that "theory of Article III harm." *Id.* at 2209, 2211, n.7. Moreover, the Court rejected that the 6,332 plaintiffs *could* claim that they suffered an emotional harm injury from "the risk that a misleading credit report might be sent to a third-party business" because they failed to present any evidence that "they were even aware of the misleading information in the internal credit files maintained at TransUnion." *Id.* at 2211,

n.7.  The Court emphasized that "Congress's creation of a statutory prohibition or obligation and

a cause of action does not relieve courts of their responsibility to independently decide whether a

plaintiff has suffered a concrete harm under Article III." *Id.* at 2205.  Thus, "under Article III, an

injury in law is not an injury in fact," and a FCRA plaintiff must allege that they have been

"*concretely harmed* by a defendant's statutory violation [in order to] sue that private defendant

over that violation in federal court." *Id.*

        Following *Ramirez*, the Second Circuit provided further guidance as to how courts in this

Circuit should analyze Article III standing in claims for statutory violations in *Maddox v. Bank of

New York Mellon Tr. Co., N.A.*, 19 F.4th 58 (2d Cir. 2021).  In that case, the plaintiffs sued, on

behalf of a putative class, to collect penalties for the Bank of New York Mellon's ("BNYM")

failure to file their satisfaction of mortgage within the timeframe required under New York's

mortgage-satisfaction recording statutes. *Id.* at 59.  BNYM did not dispute that the named

plaintiffs' discharge was untimely filed, but argued that they lacked standing to sue in federal

court because they had not suffered a concrete harm. *Id.* at 60-61.

        In a decision that pre-dated *Ramirez*, the Second Circuit initially found that that the

*Maddox* plaintiffs had sufficiently established an injury in fact because BNYM's "violation of

the statutes exposed them to a 'material risk of [concrete] harm,' including the risk of not being

able to borrow during the period of delay." *Id.* at 62.  After the initial decision, BNYM filed a

petition for rehearing *en banc* and the Supreme Court rendered its decision in *Ramirez. Id.*  The

Second Circuit accordingly granted BNYM's petition, withdrew its previous opinion and

rendered another opinion holding that the plaintiffs lacked Article III standing. *Id.*

        Noting on rehearing that *Ramirez* "leaves little room for interpretation," the Second

Circuit ruled that the plaintiffs lacked constitutional standing because they failed to allege that

they suffered any tangible or intangible concrete harm. *Id.* at 62-66. Specifically, the Court found that: (i) because the plaintiffs had conveyed their property several weeks before the mortgage satisfaction occurred, there were no allegations of cloud on title; (ii) the plaintiffs did not suffer reputational harm because, although the record was publicly available at the county clerk, there was no allegation that it was read by anyone, and thus no dissemination; (iii) the risk of adverse impact on credit, including difficulty in obtaining financing had plaintiffs needed it, did not materialize and thus was "incapable of giving rise to Article III standing;" and (iv) the plaintiffs' "perfunctory allegation of emotional distress, especially one wholly incommensurate with the stimulant, is insufficient to plausibly allege constitutional standing" and, even if it were, was unlikely to be typical of the putative class. *Id.* at 64-66.

Following *Ramirez* and *Maddox*, courts in this district "have uniformly held that absent specific allegations of reputational or monetary harm, plaintiffs lack constitutional standing" to pursue FCRA claims in federal court. *Spira v. TransUnion, LLC*, No. 21-CV-2367 (KMK), 2022 WL 2819469, at *4 (S.D.N.Y. July 19, 2022). Accordingly, courts have rejected "conclusory allegations" of mental or emotional distress as sufficient basis to find the concrete harm required to establish standing. *See, e.g.*, *Gross,* 607 F. Supp. 3d at 273 (conclusory allegations of "embarrassment, humiliation, and other emotional injuries" insufficient for Article III standing); *Zlotnick v. Equifax Info. Servs., LLC*, 583 F. Supp. 3d 387, 391 (E.D.N.Y. 2022) ("Plaintiff does allege that he suffered 'mental and emotional pain,' however such conclusory assertions do not confer standing."). Moreover, courts have declined to find harm based on a lowered credit score absent other "concrete consequences" resulting therefrom, *id.*, or based solely on disclosure to CRAs, *Spira*, 2022 WL 2819469, at *4. With these principles in mind, the Court analyzes the parties' constitutional standing arguments.

**ii. Plaintiff's BANA Claims**

BANA argues that Plaintiff cannot establish Article III standing because: (i) he has not

shown that any allegedly inaccurate credit information was disseminated to a third-party

business, and (ii) he has not demonstrated that he suffered any harm from the allegedly

inaccurate information. (BANA Opp'n at 13-15).  On reply, Plaintiff asserts that: (i) BANA's

communication of the information to TransUnion, a CRA, constitutes dissemination sufficient to

establish standing; and (ii) the information was harmful because it allowed "adverse" accounts to

continue to be reported on Plaintiff's credit report for longer than authorized by the FCRA. (Pl.

Reply at 9-12).[7]

The Court begins with Plaintiff's argument that he has Article III standing because the

alleged actions allowed "adverse" accounts to continue to be reported on Plaintiff's credit report

for longer than authorized by the FCRA.  (Pl. Reply at 9-12).  Plaintiff's argument, in essence, is

that he was harmed by the statutory violation.  This argument was flatly rejected in *Ramirez*.

*Maddox*, 19 F.4th at 64 ("In sum, [*Ramirez*] established that in suits for damages plaintiffs

cannot establish Article III standing by relying entirely on a statutory violation or risk of future

harm: 'No concrete harm; no standing.'") (quoting *Ramirez*, 141 S. Ct. at 2214).  Accordingly,

Plaintiff must show some concrete harm, other than a bare statutory or procedural violation, to

establish Article III standing. *Spira*, 2022 WL 2819469, at *3 ("The Supreme Court recently

issued a decisive ruling on the issue of constitutional standing in [*Ramirez*] which, along with its

_____

[7] Plaintiff also argues that Plaintiff did not originally bring this action in federal court, and thus it is Defendants who
originally asserted Article III jurisdiction by removing the action. (Pl. Reply at 8-9).  Plaintiff is correct that
Defendant TransUnion removed this action to federal court. (Docket No. 1).  However, "since 'standing is not
dispensed in gross,' it is part of the plaintiff's burden … to 'demonstrate standing for each claim that they press and
for each form of relief that they seek.'" *Grauman v. Equifax Info. Servs., LLC*, 549 F. Supp. 3d 285, 290 (E.D.N.Y.
2021) (citing *Ramirez*, 141 S. Ct. at 2208).  Moreover, the Court has "an independent obligation to resolve any issue
about their subject matter jurisdiction *sua sponte*." *Gross*, 607 F. Supp. 3d at 270.

Second Circuit progeny, [*Maddox*], makes clear that plaintiffs who allege only a 'procedural' or 'informational' harm lack standing.").

Next, Plaintiff argues that he was harmed because BANA disseminated the allegedly inaccurate information to the CRAs. (Pl. Reply at 9-12). However, courts have emphasized that, "in [the FCRA] context, not all 'third parties' are created equal." *Spira*, 2022 WL 2819469, at *4. In *Ramirez*, the Supreme Court distinguished between credit files maintained internally by CRAs and "the consumer credit reports that consumer reporting agencies disseminate to third-party creditors," noting that "[t]he mere presence of an inaccuracy in an internal credit file, if it is not disclosed to a third party, causes no concrete harm." *Ramirez*, 141 S. Ct. at 2210. Citing this language, courts have found that "credit reporting agencies … are not the type of third parties contemplated by the Supreme Court in *TransUnion*; rather, the Supreme Court clearly contemplated potential creditors." *Spira*, 2022 WL 2819469, at *5. After years of discovery, Plaintiff makes no allegation, and sets forth no evidence, that BANA disseminated Plaintiff's allegedly inaccurate information to any third parties, other than CRAs. (*See* Pl. Reply at 9). Moreover, Plaintiff cites to no authority from this Circuit that advances the publication argument that Plaintiff urges this Court to adopt here.[8] Because this dissemination does not constitute an

---

[8] Plaintiff cites to a single case from the Seventh Circuit— *Ewing v. MED-1 Sols., LLC*, 24 F. 4th 1146 (7th Cir. 2022) —in support of his argument. (Pl. Reply at 9-10). However, this decision does not analyze the FCRA. *See Ewing*, 24 F.4th at 1153 ("These appeals also differ from [*Ramirez*] in a significant regard—different statutes are implicated and the subjects whom the applicable statutes aim to regulate are different."). And, in any event, *Ewing* is not binding on this Court and runs contrary to caselaw in this Circuit holding that dissemination to a CRA alone is not sufficient to establish Article III standing. Moreover, Plaintiff urges this Court to differentiate the requirements for constitutional standing for a FCRA claim brought under section 1681s-2(b). (Pl. Reply at 9). However, the Supreme Court and Second Circuit have made clear that a mere statutory violation is not enough to establish Article III standing—"[n]o harm, no standing." This holding was not limited to a specific provision of the FCRA, as evidenced by the Second Circuit's broad language in *Maddox*, applying *Ramirez* to a New York mortgage-satisfaction recording statute and noting that "in suits for damages plaintiffs cannot establish Article III standing by relying entirely on a statutory violation or risk of future harm." *Maddox*, 19 F.4th at 64; *see also Zlotnick*, 583 F. Supp. 3d at 391 ("In the FCRA context, the Supreme Court made clear that 'a bare procedural violation, divorced from any concrete harm' fails to satisfy the injury-in-fact requirement of Article III.") (quoting *Spokeo*, 578 U.S. at 341). Thus, Plaintiff's need to demonstrate a concrete harm is not obviated by a particular subprovision.

injury in fact, it cannot form the basis of Article III standing here. *See Spira*, 2022 WL 2819469, at *4-*5; *Charles v. TransUnion, LLC*, 19-CV-3579 (WFK) (ST), 2022 WL 4539693, at *2 (E.D.N.Y. Sept. 28, 2022); *Zlotnick*, 583 F. Supp. 3d at 391; *see also Maddox*, 19 F.4th at 65 (holding no harm where the information was viewable to the public at the county clerk but "read by no one" and distinguishing from the credit reports in *Ramirez*, where "[t]here could be no doubt that the third-party businesses viewed those credit reports, which they had specifically requested and paid for").

While not raised by Plaintiff in his response to Defendants' standing claims, Plaintiff alleged two further bases of harm in the second amended complaint. First, Plaintiff alleges that he "was unable to obtain needed loans for his business and personal life." (Docket No. 104 (SAC), ¶ 59). However, Plaintiff has presented no evidence of the denial of a needed loan. Indeed, in his deposition, Plaintiff testified that he had not applied to, or been denied, employment or a line of credit during the period at issue, in reliance on the advice of family members that such applications would likely be denied. (Docket No. 225-4, Pl. Dep. (Soumilas Ex. 32), at 35-37; 74-76 (did not recall applying for jobs or lines of credit)). Second, Plaintiff states that his credit score decreased and his creditworthiness "was diminished" because of BANA's disclosure of the information at issue to the CRAs. (Pl. Reply at 12). Plaintiff's only support for this assertion is citations to Plaintiff's expert report, where the expert says that BANA's allegedly faulty procedures were "extremely *likely* to hurt consumers," "*will* impact credit scores and creditworthiness," and "*likely*" impacted Plaintiff's credit score and creditworthiness." (Docket No. 259-1, Expert Report of Thomas A. Tarter (Soumilas Reply Decl., Ex. 33) at 41, 43 (cited in Pl. Reply at 12)) (emphasis added). Plaintiff also cites to a statement from Plaintiff's expert's deposition where he testified that BANA's failure to "purge

outdated credit information was *likely* to impact" Plaintiff's credit score and creditworthiness. (Docket No. 259-2, Tarter Dep. (Soumilas Reply Decl., Ex. 34), at 95-96 (cited in Pl. Reply at 12)) (emphasis added). Therefore, Plaintiff's sole factual support as to his allegations regarding impacted creditworthiness, both as to himself (and as to putative BANA class members), is based on the hypothetical likelihood of harms on credit score and creditworthiness materializing, assuming a statutory violation occurred. Further, Plaintiff ultimately was approved for an auto loan with the BANA mortgages appearing on his credit report—testifying that the car dealership "told [him] that [his] credit [was] excellent." (Docket No. 225-4, Pl. Dep. (Soumilas Ex. 32), at 39; *see also* Docket No. 225-4, Decl. of Capital One Auto Finance in Resp. to Pl. Maurice Konig's Third Party Subpoena (Soumilas Ex. 28)). Thus, Plaintiff's claim that BANA's actions "adversely affected [his] credit during that time, making it difficult to obtain financing had [he] needed it" is a "purported risk" that never "materialized," and is thus "incapable of giving rise to Article III standing." *Maddox*, 19 F.4th at 65; *see also Gross*, 607 F. Supp. 3d at 273 (rejecting allegations of impact on creditworthiness as sufficient for Article III standing where the court was left to "hypothesize" how the alleged mistake "caused plaintiff's alleged injuries"); *Charles*, 2022 WL 4539693, at *2 ("Plaintiff also admitted he never applied for and was never denied credit when the tradeline was reporting in 2019, and he had not pursued any employment opportunities during the time in which his credit rating may have been adversely affected by the report….There is no evidence Plaintiff suffered any particularized or concrete harm because of the alleged credit error."); *Zlotnick*, 583 F. Supp. 3d at 392 ("Absent from plaintiff's submissions are any allegations or other support that plaintiff was in fact denied credit or that plaintiff suffered any concrete consequences as a result of an allegedly lowered credit score. A lowered credit score in and of itself is not a concrete harm.").

Plaintiff has also alleged that he "was caused significant embarrassment and humiliation and suffered depression, insomnia, low self-worth, anxiety and other related distress." (Docket No. 104 (SAC), ¶ 59). While Plaintiff's second amended complaint contains allegations as to emotional harm, and he testified regarding the same, he does not repeat these allegations as an independent basis for Article III standing now. In any event, "[a] perfunctory allegation of emotional distress, especially one wholly incommensurate with the stimulant, is insufficient to plausibly allege constitutional standing." *Maddox*, 19 F.4th at 66; *see Spira*, 2022 WL 2819469, at *5-*6 (holding allegations that "Plaintiff suffered damage for the loss of credit, loss of the ability to purchase and benefit from credit, a chilling effect on future applications for credit, and the mental and emotional pain, anguish, humiliation[,] and embarrassment of credit denials" insufficient to establish Article III standing); *Gross*, 607 F. Supp. 3d at 273 (conclusory allegations of "embarrassment, humiliation, and other emotional injuries" insufficient for Article III standing); *Rosenberg v. LoanDepot, Inc.,* 21-CV-08719 (PMH), 2023 WL 1866871, at *5 (S.D.N.Y. Feb. 9, 2023) ("Plaintiff cannot have been humiliated by credit denial when she was never denied credit."). Accordingly, Plaintiff's conclusory allegations of emotional harm are insufficient to establish constitutional standing.

Plaintiff therefore lacks Article III standing, and cannot pursue the BANA claims on behalf of the putative class in federal court.

### iii. Plaintiff's TransUnion Claims

TransUnion argues that Plaintiff has failed to demonstrate class-wide Article III standing. (TransUnion Opp'n at 22-24; TransUnion Sur-Reply at 1-3). Plaintiff replies that he has made a sufficient showing as to class-wide standing at this stage of the litigation. (Pl. Reply at 28-30).

To begin, TransUnion inappropriately focuses exclusively on the Article III standing of the putative class members, rather than Plaintiff. (TransUnion Opp'n at 22-24; TransUnion Sur-Reply at 1-3). Specifically, TransUnion places heavy emphasis on the Second Circuit's language in *Denney v. Deutsch Bank AG* that "no class may be certified that contains members lacking Article III standing." (TransUnion Opp'n at 22) (citing *Denney v. Deutsche Bank AG*, 443 F.3d 253, 264 (2d Cir. 2006)). However, Circuit Judge Richard J. Sullivan (sitting by designation) has noted that reliance on this sentence "fails to account for the surrounding context of that statement" because "[i]n the very same paragraph, the Second Circuit also explained that '[p]assive members need not make any individual showing of standing, because the standing issue focuses on whether the [named] plaintiff is properly before the court, not whether represented parties or absent class members are properly before the court.'" *Nnebe v. Daus*, No. 06-cv-4991 (RJS), 2022 WL 1204700, at *2, n.2 (S.D.N.Y. Apr. 22, 2022) (quoting *Denney*, 443 F.3d at 264). Accordingly, "only one of the named Plaintiffs is required to establish standing in order to seek relief on behalf of the entire class." *Id*. at *2 (quoting *Cent. States Se. & Sw. Areas Health & Welfare Fund*, 504 F.3d at 241); *see also In re AXA Equitable Life Ins. Co. COI Litig.*, No. 16-CV-740 (JMF), 2023 WL 199284, at *1 (S.D.N.Y. Jan. 17, 2023) ("[*Ramirez*] did not alter the well-established law in this Circuit — reaffirmed by the Court of Appeals only a few months ago — that standing in a class action is satisfied so long as at least one named plaintiff can demonstrate the requisite injury") (citation and quotations omitted). And to the extent that TransUnion's argument is that "the named Plaintiff[] lack[s] adequate 'standing' to pursue not [his] own claims, but the claims of absent class members, that argument would go to the propriety of class certification, not Article III standing." *Nnebe*, 2022 WL 1204700, at *2.

As to Plaintiff's constitutional standing, Plaintiff claims that "TransUnion reported

harmful and legally not reportable information about [Plaintiff] to a third party." (Pl. Reply at

29).  While Plaintiff does not specify what third party TransUnion published "harmful"

information to, the Court assumes that Plaintiff is referring to Capital One Auto—as that is the

only third-party creditor referenced in the briefing. (*See* Docket No. 225-4, Decl. of Capital One

Auto Finance in Resp. to Pl. Maurice Konig's Third Party Subpoena (Soumilas Decl., Ex. 28)).

However, Plaintiff has not alleged actual tangible harm resulting from this disclosure, and thus

"under [*Ramirez*] he must demonstrate some other harm that bears a 'close relationship to a harm

traditionally recognized as providing a basis for a lawsuit in American courts.'" *Sputz v. Alltran*

*Fin., LP*, No. 21-CV-4663 (CS), 2021 WL 5772033, at *3 (S.D.N.Y. Dec. 5, 2021) (quoting

*Ramirez*, 141 S. Ct. at 2204).  Plaintiff argues that the disclosure of the allegedly inaccurate

information here (*i.e.*, "obsolete" information regarding a "current" account status) "causes a

harm akin to defamation" like the class members found to have standing in *Ramirez*. (Pl. Reply

at 29).  However, "[t]he criminality aspect of the information disseminated was material to the

finding of reputational harm as a basis for standing in [*Ramirez*]" and "[t]hat type of allegation is

simply absent here." *Rosenberg,* 2023 WL 1866871, at *4.  Moreover, it is undisputed that

Plaintiff's loan application was approved, (Docket No. 225-4, Decl. of Capital One Auto Finance

in Resp. to Pl. Maurice Konig's Third Party Subpoena (Soumilas Decl., Ex. 28)), and thus

"Plaintiff simply fails to allege that [he] faced any real-world—tangible or intangible—

consequences" as a result of that dissemination. *Id.*; *see also Krausz v. LoanDepot.com, LLC*, 22-

CV-152 (VB), 2022 WL 16960928, at *3 (S.D.N.Y. Nov. 16, 2022) (credit report showing "hard

pulls" on credit report for third-party credit determinations insufficient to demonstrate Article III

standing where plaintiff did not "show plaintiff suffered an actual credit denial, reputational

harm, or any other concrete adverse consequences" resulting from those pulls); *Reimer v. LexisNexis Risk Sols., Inc.*, Civil No. 22cv153 (DJN), 2022 WL 4227231, at *8 (E.D. Va. Sept. 13, 2022) (finding that "[c]ases that find dissemination alone sufficient to confer standing involve a heightened risk of harm based on the nature of the information shared with third parties" and rejecting claim that dissemination of allegedly inaccurate information concerning driver's license number and state of issuance "reach the level of a defamatory statement" because "[t]his type of information does not rise to the level of subjecting Plaintiff to potential hatred, contempt or ridicule"). Accordingly, because Plaintiff does not set forth any allegations of a concrete, particularized injury arising from the dissemination of the allegedly obsolete information—whether tangible or intangible—he lacks Article III standing based on this dissemination alone.

Plaintiff's remaining allegations regarding harms—*i.e.*, based on loss of credit opportunities, harm to credit and emotional harms—do not differ from those he advances in support of his BANA allegations. For the same reasons outlined above, *see supra* Section II.C.ii., the Court finds that these allegations do not provide Article III standing for Plaintiff's TransUnion claims.

Because the Court concludes that Plaintiff does not have Article III standing, the Court does not reach the remaining arguments regarding class certification, and denies his motion for class certification. *See Ross v. AXA Equitable Life Ins. Co.*, 115 F. Supp. 3d 424, 438 (S.D.N.Y. 2015), *aff'd*, 680 F. App'x 41 (2d Cir. 2017) (concluding that the plaintiff lacked Article III standing and holding that the plaintiff's "motion for class certification must be and is denied as moot"); *Schroedel v. New York Univ. Med. Ctr.*, 885 F. Supp. 594, 600-01 (S.D.N.Y. 1995) (same).

#### iv. Remedy

Plaintiff correctly notes that, since Plaintiff filed this action in state court and Defendants subsequently removed it, the proper remedy is remand—not dismissal. A district court must remand a case to state court "[i]f at any time before final judgment it appears that the district court lacks subject matter jurisdiction." 28 U.S.C. § 1447(c). "When a defendant is sued in state court on a claim appropriately brought in state court, which a federal court would be powerless to adjudicate, the defendant may not defeat the claim by removing it to federal court and then obtaining its dismissal on the grounds of the federal court's lack of jurisdiction." *Vossbrinck v. Accredited Home Lenders, Inc.*, 773 F.3d 423, 427 (2d Cir. 2014). Accordingly, this Court lacks subject matter jurisdiction to adjudicate Plaintiff's claims, and, thus, this matter is remanded to state court.

### III. CONCLUSION

For the reasons set forth herein, Plaintiff's motion for class certification (Docket No. 222) is denied. Further, because the Court concludes that Plaintiff does not have Article III standing and, thus, this Court lacks subject matter jurisdiction, Plaintiff's case is remanded to Supreme Court of the State of New York, County of Rockland. The Clerk of the Court is respectfully requested to remand the case and terminate this action.

Dated:   April 13, 2023
         White Plains, New York

SO ORDERED:

JUDITH C. McCARTHY
United States Magistrate Judge